IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

**STEPHEN TORRES, as Personal Representative
of the Estate of CHRISTOPHER TORRES, deceased.**

      Plaintiff,

v.                                                                                      No.

**CITY OF ALBUQUERQUE**, ex. rel
**ALBUQUERQUE POLICE DEPARTMENT;
CHRISTOPHER BROWN; and
RICHARD HILGER,**

      Defendants.

## COMPLAINT FOR DEPRIVATION OF CIVIL RIGHTS AND VIOLATION OF AMERICANS WITH DISABILITIES ACT

Plaintiff Stephen Torres, Personal Representative for the wrongful death estate of his son, Christopher Torres, through his attorneys, McGinn, Carpenter, Montoya & Love, P.A., states the following as his complaint against Defendants Albuquerque Police Department, Christopher Brown, and Richard Hilger.

### PARTIES, JURISDICTION, AND VENUE

1. At the time he was shot by APD officers on April 12, 2011, Christopher Torres was a resident and domiciliary of Albuquerque, New Mexico. He lived with his parents, Stephen and Renetta Torres.

2. Plaintiff Stephen Torres (Christopher Torres's father) is, and was at all times pertinent hereto, a resident and domiciliary of Albuquerque, New Mexico.

3. Plaintiff Stephen Torres was appointed by New Mexico's Second Judicial District Court as the personal representative of Christopher Torres's Estate for purposes of bringing wrongful death claims.

1

4. The Albuquerque Police Department is a government law enforcement agency operating within the City of Albuquerque, State of New Mexico.

5. Defendant Christopher Brown is, and was at all times pertinent hereto, a resident and domiciliary of Albuquerque, New Mexico.

6. Defendant Richard Hilger is, and was at all times pertinent hereto, a resident and domiciliary of Albuquerque, New Mexico.

7. Plaintiff's claims arise under 42 U.S.C. § 1983 and 42 U.S.C. § 12132 and seek damages for the deprivation of Christopher Torres's civil rights and for discrimination against Christopher Torres based on a disability.

8. This Court has original federal question jurisdiction under the Constitution and laws of the United States pursuant to 28 U.S.C. §§ 1331, 1343(a)(3).

9. The events giving rise to this controversy occurred in Albuquerque, New Mexico.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### Police Departments Must Not Create a Culture of Use of Excessive Force

11. The purpose of a police department is to protect the safety of the community it serves and to protect its citizens.

12. Police departments such as APD must establish standard operating procedures, training, monitoring, discipline and supervision that prevent violation of citizens' civil rights and excessive force, rather than encourage such violations.

13. When made aware of problems of the systematic use of excessive force and violation of citizens' rights within the department, police departments such as APD, cannot maintain the status quo, but must act to stop such misconduct.

14. When the number of citizen deaths at the hands of police officers exceeds that of other similarly-sized departments, a police department should realize it has a problem and change the policies and culture of the department to protect citizens.

**Police Departments May Not Discriminate Against Citizens with Disabilities**

15. The Americans with Disabilities Act prohibits police departments from discriminating against a citizen who has a disability such as a mental illness.

16. Police departments like the Albuquerque Police Department may not, on the basis of disability, deny a citizen aid, benefits, and services offered to other citizens.

17. Police departments must provide citizens with a disability an equal opportunity to obtain the same aid, benefits and services as other citizens.

18. A police department must have policies and procedures in place to ensure that all of its officers are adequately trained to learn about and recognize signs of mental illness and to recognize when officers with more extensive crisis intervention training should be called to a scene.

19. A police department must have sufficient policies, procedures, protocols, and systems in place to ensure that officers executing routine, non-emergency arrest warrants are alerted about the known existence of an arrestee's mental health condition before the encounter.

**Police Should not Use Excessive Force on Citizens**

20. Police officers are sworn to protect, not harm, the citizens of their community, including those with a mental disability.

21. Police officers must approach all interactions with citizens, particularly those suffering from mental disabilities, calmly and professionally, with the intent to deescalate rather than escalate any encounter.

22. Before executing a non-emergency arrest warrant, police officers should investigate the background and criminal history of the person to be arrested, in order to determine if he/she suffers from a mental disability.

23. If there is any question that a police officer cannot safely execute a non-emergency arrest warrant on a citizen, particularly one suffering from a mental disability, he/she must turn the job over to someone who is trained to deal with such a problem.

24. Police officers must also be trained and be aware of the indications or signs of mental illness in the citizens they encounter.

25. When police officers see signs of mental illness in a citizen they are attempting to arrest, if they themselves are not specially trained to deal with the citizen, they must seek assistance from officers who are.

26. An officer who is unnecessarily aggressive with a citizen who has a mental illness, endangers the citizen, the officers and those around them during the encounter.

27. Police officers must never use deadly force against a citizen who does not pose a threat of serious physical harm to them or someone else.

28. Officers must use all lesser means available before resorting to deadly force.

**Christopher Torres**

29. Christopher Torres was a citizen of Albuquerque who held a job, was active in his church and lived with his parents, where he contributed to the household.

30. Christopher Torres was 27 when he was shot and killed by an Albuquerque Police Department officer.

31. Christopher Torres had been diagnosed with schizophrenia, for which he was under the treatment of a psychiatrist at the time he was shot and killed.

32. Christopher Torres' parents had informed the Albuquerque Police Department on more than one occasion that their son, Christopher Torres suffered from schizophrenia, and should be contacted by specially trained crisis intervention officers if contact by the police was ever necessary.

33. Months before their son was killed, Christopher's parents had also informed APD that they should be contacted and would cooperate if police ever needed to make contact with their son.

34. The Albuquerque Police Department never transmitted the information from the Torres family about Christopher's condition to any police officers who might encounter him and had no adequate system in place to provide that information to its officers or to require them to look for such information before executing an arrest warrant.

35. The Albuquerque Police Department knew that Christopher Torres had a case pending in Bernalillo County Metropolitan Court in which his mental competency to stand trial was being evaluated.

36. The Albuquerque Police Department's own records contained an encounter with Christopher Torres that revealed Mr. Torres was suffering from a mental illness.

## APD Did Not Have Adequate Services to Ensure Proper Treatment of Citizens with Mental Illnesses

37. Despite the knowledge that police must encounter mentally ill citizens differently than other citizens, APD chose not to have an adequate system for tracking information that indicated mental illness or informing its officers about citizens with known mental illnesses.

38. Despite the knowledge that encounters with citizens with mental illnesses must be handled differently than encounters with citizens who do not have mental illnesses, APD chose

to provide inadequate training of its officers regarding dealings with citizens with mental illnesses.

39. Upon information and belief, more than seventy-five percent of Albuquerque Police Department officers currently are not certified in crisis intervention, or how to properly encounter individuals with mental illnesses.

40. Despite the information the Albuquerque Police Department had in its own files that demonstrated that Christopher Torres had schizophrenia, Officers Brown and Hilger went to the Torres home to serve an arrest warrant on Christopher Torres without a specially trained crisis intervention officer.

41. Neither Defendant Brown nor Defendant Hilger was certified in crisis intervention when they went to the Torres home on April 12, 2011.

42. Officers Brown and Hilger had not received adequate training to do a pre-encounter investigation to identify someone with a mental illness or to recognize that an individual such as Christopher Torres may have a mental health condition.

**The Shooting**

43. On or before April 12, 2011, APD had not given Officers Brown and Hilger any information about Christopher Torres's mental health history or diagnosis of schizophrenia and had not required them to search for any such information before executing an arrest warrant.

44. No attempts were made by APD, Officer Brown or Officer Hilger to contact Christopher Torres's family members, his psychiatrist or any CIT officers who had previously met with him.

45. Had APD officers contacted Christopher Torres's family members, they would have voluntarily assisted with Christopher's arrest and helped him navigate the legal system and he would be alive today.

46. Had APD sent properly trained CIT officers to arrest Christopher Torres, he would be alive today.

47. Officers Brown and Hilger went to the Torres home and conducted themselves in an improper manner that would heighten the anxiety and fear of most any citizen, but would be especially frightening to someone suffering from schizophrenia like Christopher Torres.

48. Officers Brown and Hilger went to the Torres home to arrest Christopher Torres for a traffic-related incident from approximately 2 months earlier, thus there were no exigent circumstances for the arrest.

49. On the afternoon of April 12, 2011, Christopher Torres was sitting in the backyard of his home with his dog.

50. Christopher Torres was unarmed.

51. Christopher Torres was wearing his pajamas and socks, and no shoes.

52. Officers Brown and Hilger entered the backyard of the Torres home dressed in plain clothes.

53. Officer Brown jumped over a fence and Officer Hilger broke open a section of the fence to enter the backyard.

54. The two men beat Mr. Torres.

55. Within less than two minutes after the police officers entered Christopher Torres's backyard, Officer Brown shot Christopher Torres three times in the back at point blank range.

56. Christopher Torres died of the gunshot wounds.

57. Officers Brown and Hilger had no reason to believe that Christopher Torres was a threat to their safety and their use of force was excessive.

## COUNT I:
## *MONELL* CLAIM UNDER 42 U.S.C. § 1983 RESULTING IN THE DEPRIVATION OF CHRISTOPHER TORRES'S CIVIL RIGHTS AGAINST DEFENDANT APD

All previous paragraphs are incorporated herein by reference.

58. Albuquerque Police Department's policy and practice of inadequate training and culture of excessive use of force caused the wrongful death of Christopher Torres and the violation of his constitutional right to be free from excessive use of force.

59. Before Christopher Torres's death, Defendant APD was aware of a widespread practice within the department of resorting to deadly force in situations where it was not warranted, including situations where citizens were suffering from a mental disability.

60. Despite this awareness, APD had a policy and practice of failing to adequately monitor, supervise, discipline and otherwise control its police officers.

61. The large number of police shootings and violent encounters of which Defendant APD was aware before Christopher Torres was shot and killed, including many people with mental disabilities, shows a permanent and well-settled practice of its officers using deadly force in situations that did not warrant it.

62. Defendant APD was aware of the substantial risk that allowing the custom of its officers using excessive, deadly force against citizens to continue would pose to the public but chose not to take the appropriate steps to protect citizens.

8

63. Defendant APD's policymakers were deliberately indifferent as to the department's widespread practice of needlessly using excessive, deadly force and its obvious consequence of depriving citizens like Christopher Torres of their civil rights.

64. Defendant APD's deliberate indifference to the widespread practice among its officers of needlessly using deadly force directly and proximately caused the constitutional deprivation resulting in Christopher Torres's wrongful death and damages, including the loss of the value of his life, lost enjoyment of his life, lost earnings and earning capacity, pain and suffering, and lost household services.

65. Defendant APD acted intentionally, maliciously or with reckless indifference in promoting the policy and practice of use of unreasonable force, particularly against citizens with mental illnesses, thus punitive damages should be awarded to punish this conduct and prevent this type of misconduct against citizens in the future.

## COUNT II: DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT RESULTING IN CHRISTOPHER TORRES'S WRONGFUL DEATH

All previous paragraphs are incorporated herein by reference.

66. The Albuquerque Police Department is a public entity as defined by the Americans with Disabilities Act, 42 U.S.C. § 12131(1)(B) (1990).

67. The Albuquerque Police Department does not have sovereign immunity for claims arising under the Americans with Disabilities Act. 42 U.S.C. § 12202 (1990).

68. Christopher was a qualified individual with a disability as defined by the Americans with Disabilities Act, 42 U.S.C. § 12131(2) (1990).

69. On the basis of his disability, Christopher Torres was denied the benefits of services, programs, and activities of the Albuquerque Police Department, including but not limited to the benefits of:

   a. a crisis intervention officer on the scene at the time of his arrest;

   b. encounters with officers properly trained to deal with citizens with mental illnesses;

   c. being treated with dignity by the government entity sworn to protect its community's citizens.

70. On the basis of his disability, the Albuquerque Police Department discriminated against Christopher Torres by choosing not to provide adequate protection for citizens with mental illnesses.

71. On the basis of his disability, the Albuquerque Police Department discriminated against Christopher Torres by choosing to provide him with a service that was not as effective in affording equal opportunity to obtain the same result as that provided to individuals without mental disabilities.

72. The Albuquerque Police Department's decision not to use a member of its crisis intervention team in executing the arrest warrant for Christopher Torres was made with deliberate indifference to Christopher's rights.

73. The Albuquerque Police Department's decision not to require a pre-arrest investigation or alert Defendant officers Brown and Hilger about Christopher's disability was made with deliberate indifference to Christopher's rights.

74. The Albuquerque Police Department's decision not to implement sufficient policies, procedures, protocols, and systems to alert officers to known dangers posed by

individuals with mental disabilities was made with deliberate indifference to Christopher's rights.

75. Defendant APD's decision to discriminate against citizens with mental illness like Christopher Torres directly and proximately caused Christopher Torres's wrongful death and damages, including the loss of the value of his life, lost enjoyment of his life, lost earnings and earning capacity, pain and suffering, and lost household services.

76. By its discriminatory practices, Defendant APD acted intentionally, maliciously or with reckless indifference and an award of punitive damages is necessary to punish this conduct and prevent deprivation of rights to citizens in the future.

## COUNT III:
## DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 RESULTING IN CHRISTOPHER TORRES'S WRONGFUL DEATH

All previous paragraphs are incorporated herein by reference.

77. Defendant Brown is a state actor who was, at all times pertinent hereto, acting within the course and scope of his employment with the Albuquerque Police Department.

78. Defendant Hilger is a state actor who was, at all times pertinent hereto, acting within the course and scope of his employment with the Albuquerque Police Department.

79. At all times pertinent hereto, Defendants Brown and Hilger were acting under the color of law.

80. Christopher Torres had a clearly established right under the Fourth Amendment of the Constitution to be free from the excessive use of force by law enforcement officers.

81. Defendants Brown and Hilger's decision to beat Mr. Torres, who was unarmed and did not pose a threat of serious physical harm to them or anyone else, was unreasonable.

82. When Defendant Brown shot the unarmed Mr. Torres three times at contact range in the back, he had no reason to believe that Mr. Torres posed a threat of serious physical harm to him or anyone else.

83. If any time any type of force was necessary, the need for force was created by Defendants Brown and Hilger's unreasonable conduct.

84. The actions of Defendants Brown and Hilger were not justified under clearly established law under the Fourth Amendment to the Constitution and resulted in the deprivation of Christopher Torres's civil rights.

85. As a direct and proximate result of Defendant Brown and Hilger's actions, Christopher Torres suffered wrongful death and damages, including the loss of the value of his life, lost enjoyment of his life, lost earnings and earning capacity, pain and suffering, and lost household services.

86. Defendants Brown and Hilger acted intentionally, maliciously or with reckless indifference when they beat and shot Christopher Torres to death and an award of punitive damages is necessary to punish this conduct and prevent this kind of mistreatment of Albuquerque citizens in the future.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff Stephen Torres respectfully requests that the Estate of Christopher Torres be awarded compensatory and punitive damages against Defendants APD, Brown and Hilger in an amount to be proven at trial, costs, pre-judgment interest, post-judgment interest, attorney fees, and any and all other relief that this Court deems to be proper and appropriate.

Plaintiff also demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(a).

Respectfully submitted by,

McGinn, Carpenter, Montoya & Love, P.A.

/s/ Kathleen J. Love

Kathleen J. Love
Tyler J. Atkins
Randi McGinn
201 Broadway Blvd., SE
Albuquerque, NM  87102
t/  (505) 843-6161
f/  (505) 242-8227

*Attorneys for the Torres family*

~JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
STEPHEN TORRES, as Personal Representative for CHRISTOPHER TORRES, deceased

**DEFENDANTS**
CITY OF ALBUQUERQUE, ex. rel ALBUQUERQUE POLICE DEPARTMENT; CHRISTOPHER BROWN; and RICHARD HILGER

(b) County of Residence of First Listed Plaintiff: **Bernalillo**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: **Bernalillo**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
McGinn, Carpenter, Montoya & Love, P.A.
201 Broadway SE
Albuquerque, New Mexico 87102

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights / ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
**42 U.S.C. § 1983 and 42 U.S.C. § 12132**

Brief description of cause:
**Civil Rights Deprivation and Disability Discrimination Resulting in Christopher Torres's Death**

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ **Wrongful Death Damages**

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)
JUDGE _____    DOCKET NUMBER _____

DATE: 10/09/2012

SIGNATURE OF ATTORNEY OF RECORD: *Kathleen Love*   Kathleen J. Love

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____