IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

**STEPHEN TORRES, as Personal Representative
of the Estate of CHRISTOPHER TORRES, deceased,**

      Plaintiff,

v.                                                                         No. CIV 12-1048 RB/KBM

**CITY OF ALBUQUERQUE**, ex rel.
**ALBUQUERQUE POLICE DEPARTMENT;
CHRISTOPHER BROWN; and
RICHARD HILGER**,

      Defendants.


## PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE THE UNRELIABLE EXPERT TESTIMONY OF TOXICOLOGIST DON FISHER, M.D.

Plaintiff Stephen Torres, through his attorneys of record, McGinn, Carpenter, Montoya and Love, P.A., and pursuant to Federal Rules of Evidence 403, 702, and 703, hereby requests that the Court issue an order excluding the unreliable testimony of Defendants' designated expert witness Don Fisher, M.D. at trial because:

1. Dr. Fisher is a specialist in the field of medical toxicology who does not have any expertise in the areas of psychiatry, psychopharmacology, or psychology that would be required under Rule 702 to allow him to offer expert opinion testimony about how any chemical substance affects the behavior of a person;

2. Dr. Fisher has offered expert testimony in a number of cases related to medical toxicology (i.e., the presence of chemicals in a person's system) but has never once offered an expert opinion about the effects of a chemical substance on a person's behavior;

3. Dr. Fisher's opinions about how synthetic marijuana affected Christopher Torres' behavior are wholly based on anecdotal, unreliable literature whose authors admit is incomplete and not fully or adequately studied, not on any of his own experience or studies as a toxicologist; and

4. Allowing Dr. Fisher to offer his unreliable opinions at trial would result in unfair prejudice to Plaintiff, making them inadmissible under Rule 403.[1]

## INTRODUCTION

After Christopher Torres was shot in the back three times and killed by APD Detective Christopher Brown, the Office of the Medical Investigator performed a toxicology screen that was negative for alcohol and drugs of abuse, including, benzodiazepines, opioids, stimulants, amphetamines, pcp, and marijuana.  **(Ex. A, OMI Toxicology Report)**  Long after this suit was filed, the City obtained a sample of Christopher's preserved, femoral blood and sent it to a laboratory in Willow Grove, Pennsylvania (NMS Labs) for a second toxicology screen.  **(Ex. B, NMS Toxicology Report)**  According to the report issued by that laboratory, and different from what was reported by the Office of the Medical Examiner, the sample was positive for three substances:  JWH-122, JWH-250, and Mirtazapine.  (*Id.*)  JWH-122 and JWH-250 are synthetic cannabinoids (synthetic marijuana) commonly referred to as "Spice," which was legally sold to retail customers in New Mexico at the time Christopher was killed.  Mirtazapine is an antidepressant that was prescribed to Christopher.  Christopher was also taking the prescribed medication Aripiprazole (sold as Abilify), prescribed by his psychiatrist, at the time of his death to help him cope with his diagnosed schizophrenia.

At trial, the City intends to call Dr. Don Fisher, M.D., a specialist in the field of medical toxicology, to testify that he believes that a causal link to Christopher's death was Christopher's allegedly aggressive and psychosis-driven behavior resulting from his supposed impairment from synthetic marijuana and failure to take his Aripiprazole medication.  **(Ex. C, Expert Report at 7)**  The foundational bases for this opinion are that (1) Christopher was under the influence of synthetic marijuana when he was killed; (2) Christopher had not taken his prescription

---

[1] Pursuant to Local Rule 7.1, Defendants were contacted to determine whether this motion is opposed.  As of the filing of motion, no response has been received.  Defendants' opposition is therefore assumed.

Aripiprazole to help him control his schizophrenia on the day he was killed; and (3) as a result, Christopher must have been in an overly aggressive and psychotic state when he was killed.  (**Id. at 7-8**)

Not only are the opinions that Dr. Fisher seeks to offer at trial highly speculative and based exclusively on unreliable data from medical journal articles, but they fall squarely outside his discrete area of expertise—medical toxicology.  Because his opinions do not meet the minimum standards of New Mexico's rules of evidence and case law to be appropriately helpful to the jury in this case, his testimony must be excluded.

## ARGUMENT

Under well-established Tenth Circuit law, a person who is judicially determined to be qualified in a specifically defined area of expertise may offer scientific knowledge at trial as opinion testimony, as long as such testimony is relevant, reliable, and will meaningfully assist the jury.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-91 (1993); *see also* Rules 702, 703.  In determining whether to allow the testimony of a proffered expert, the District Court exercises a "gatekeeping role" and must be satisfied that the proposed testimony "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 596-97.  Such an affirmative showing of reliability by the party tendering the expert is the hallmark for the admissibility of scientific knowledge, and if it is not met, the expert must not be permitted to testify at trial.  *Id.* at 589-90.

I. **DR. FISHER IS NOT A SPECIALIST IN THE FIELD OF PSYCHIATRY AND IS NOT QUALIFIED TO OFFER EXPERT TESTIMONY REGARDING THE BEHAVIORAL EFFECTS OF CHEMICALS**

The initial showing that a party must make in attempting to offer a person's expert testimony is that the offered expert is "qualified" in a particular field.  Rule 702.  An expert can

3

only be deemed to be "qualified" to testify about his particular area of expertise and may only give an opinion on matters pertaining to ***his field*** as it relates to an important question of fact. *Vigil v. Burlington N. & Santa Fe Ry. Co.*, 521 F. Supp. 2d 1185, 1204 (D.N.M. 2007). "[T]he proponent of expert testimony must show that the witness' experience, and resultant specialized knowledge, is sufficiently related to the issues and evidence." *Id.* "In assessing a witness' qualifications, the dispositive question is whether the issue at hand is within the reasonable confines of the witness' subject area." *Id.* (internal quotation marks and citation omitted). "Where alleged expertise with regard to other aspects of a field give a proffered expert no special insight into the issues of the case, such alleged expertise does not qualify the witness as an expert." *Id.*; *Broadcort Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1195 (10th Cir. 1992) (rejecting the argument that a proffered expert should be permitted to testify by virtue of his general experience and education and despite his "actual experience" in the specific areas germane to the case); *see also Lopez v. Reddy*, 2005-NMCA-054, ¶ 18, 137 N.M. 554, 113 P.3d 377 (excluding the expert testimony of an oncologist who "lacked the qualifications to testify as to the standard of care applicable" to the defendant vascular surgeon who performed a biopsy of breast tissue); *Smith v. Rasmussen*, 249 F.3d 755, 759 (8th Cir. 2001) (affirming the exclusion of the testimony of an expert witness that "was based neither on his personal experience nor on his knowledge of the relevant discipline").

Dr. Fisher is a licensed medical toxicologist whose clinical practice is generally isolated to the treatment of patients who have been exposed to toxins **(Ex. D, Fisher Depo. at 35:14-17)** His subspecialty is defined as one that "focus[es] on the diagnosis, management and prevention of poisoning and other adverse health effects due to medications, occupational and environmental toxins, and biological agents." http://www.acmt.net/overview.html. Although

4

Dr. Fisher admits that his particular area of expertise is in the field of medical toxicology and does not purport to be a practitioner in the fields of psychiatry, psychopharmacology, or any other field of behavioral medicine that would involve the study of how drugs affect the behavior of a person, the opinions he seeks to give focus exclusively on that. **(Ex. D, Fisher Depo. at 5:12-18, 9:23 – 11:1, 107:16 – 108:4; Ex. C, Fisher Report at 7)** His opinion begins with his conclusion that because synthetic marijuana was detected in the NMS Toxicology Report and Aripiprazole was not, Christopher must have been under the influence of synthetic marijuana and not assisted by his schizophrenia medicine at the time he was killed. **(Ex. C, Fisher Report at 7)** It ends with his conclusion that "[t]he combination of antipsychotic medication noncompliance and Spice use culminated in the altercation with law enforcement that led to his death." **(*Id.* at 8)** This conclusion is an opinion about how chemicals, both brain and otherwise, likely affected the behavior of Christopher Torres—a topic that falls far outside Dr. Fisher's area of expertise.

Dr. Fisher expressly acknowledges that he is only qualified to testify about medical toxicology. **(Ex. D, Fisher Depo. at 107:16 – 108:4)** He further acknowledges that he (1) has never participated in studies related to the behavioral effects of *any* drug **(*Id.* at 117:21 – 118:1, 164:17-22)**; has never testified as an expert about the behavioral effects of any drugs, apart from alcohol and a muscle building supplement **(*Id.* at 118:3 – 119:18)**; has never witnessed any person under the influence of synthetic marijuana **(*Id.* at 34:22 – 35:2)**; does not have expertise in the treatment of psychiatric conditions **(*Id.* at 11:16-18)**; and would defer to a psychiatrist to provide expert testimony about the treatment of schizophrenia. **(*Id.* at 109:23 – 110:8)** Despite all this, the City seeks to offer his testimony to argue about how certain drugs affected Christopher's brain chemistry in such a way that caused him to act aggressively and force

5

Officers Brown and Hilger to kill him.  This falls far outside Dr. Fisher's limited area of expertise (medical toxicology) and is therefore inadmissible under Rule 702, Rule 703, and the well-established case law on the *Daubert* standard.

> **II.    EVEN IF DR. FISHER WERE QUALIFIED TO OFFER OPINIONS REGARDING PSYCHIATRY AND THE BEHAVIORAL EFFECTS OF DRUGS ON A PERSON, HIS OPINIONS DO NOT REST UPON A RELIABLE FOUNDATION**

If an offered expert witness is able to adequately demonstrate his expert qualifications, he must then show that his opinion "will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592.  This requires a sufficiently comprehensive, well-explained, well-supported, and reliable explanation of his opinion that satisfies the Court that the testimony would meaningfully assist in applying the facts of the case to the law.  *See id.* at 592-93.  In the context of scientific, medical expert testimony, the following "*Daubert*" factors should be considered in determining whether that hurdle has been cleared:

1. Whether a theory can be (and has been) tested;

2. Whether the theory has been subjected to peer review;

3. The known error rate associated with the theory and whether there exist standards associated with applying the theory;

4. Whether the theory has been generally accepted in the particular scientific field; and

5. Whether the theory is capable of supporting opinions based upon reasonable probability rather than conjecture.

*Id.* at 592-95.  Applying those factors to Dr. Fisher's opinions, it becomes readily apparent that they are based much more on mere conjecture than they are on solid scientific theory.

Distilled to its core, Dr. Fisher's theory is that Christopher's behavior gave Officers Brown and Hilger good reason to kill him and that his behavior was the result of his altered brain

chemistry at the time he was killed. It rests largely on his assumption that because the NMS toxicology report showed traces of synthetic marijuana, Christopher was under the influence of that substance at the time he was killed.[2] He bases his opinion exclusively on his review of several articles published in various medical journals and his attendance of a conference "focused on alcohol and marijuana issues" at which there was a presentation on synthetic marijuana that lasted "[a] couple hours" and not on any actual studies or case studies in which he participated in undertaking or on his interaction with any of his patients. **(Ex. D, Fisher Depo. at 34:22 – 35:9, 37:18 – 38:24, 44:21 – 45:5, 51:1-22, 101:15-22)**

While the review of medical literature can certainly be helpful to a medical expert in forming an opinion, it cannot substitute first-hand experience. A similar situation occurred in *Smith v. Rasmussen*, a case out of the Federal District Court for the Northern District of Iowa, when an expert in the field of psychiatry sought to offer testimony on the diagnosis and treatment of a condition known as gender identity disorder. 57 F. Supp. 2d 736, 766-67. The basis for the expert's opinions was "primarily a literature review conducted in preparation for his expert report…." *Id.* at 764. Though gender identity disorder is one that can be treated by a psychiatrist like the expert offered, the Court noted that "[h]is literature review was his only real contact with the field of diagnosis and treatment of gender identity disorder" and that "[s]uch a literature review…is an insufficient basis or methodology on which to render a reliable expert opinion." *Id.* at 766. The court further noted that "[c]ourts are suspicious of purported expertise premised solely or primarily on a literature review." *Id.* (collecting cases). Identically, Dr.

---

[2] Dr. Fisher acknowledged that the only evidence he will rely on to support this assumption is the NMS toxicology report. He freely admitted that he saw nothing in the police report to suggest that anyone noticed smelling anything unusual at the scene of the shooting or that any type of drug paraphernalia was found on the scene. **(Ex. D, Fisher Depo. at 169:13-21)**

7

Fisher's purported expertise in this case is premised solely on the unreliable basis of his review some medical literature.

Not only does Dr. Fisher rely exclusively on medical literature in supporting his opinions, but he admits that the literature on which he relies does not include fully tested and reliable results.  The different studies documented in that literature differ vastly in their findings of the behavioral effects synthetic marijuana have on people.  Some did not find heightened anxiety.  (***Id.* at 78:17-21**)  Some did not find heightened agitation.  (***Id.* at 78:22-25**)  None found any increased violence or unprovoked aggression.  (***Id.* at 58:9-13, 79:10-15, 81:6-8, 89:20 – 90:6**)  Dr. Fisher admits that he has seen no study that reported paranoia that manifested in violence as a result of ingesting synthetic marijuana.  (***Id.* at 81:6-8, 81:25 – 82:3**)  Dr. Fisher goes so far as to concede that people conducting the studies have acknowledged that the results are unreliable because they lack validated and standardized human testing, many different chemical compounds fall under the category of "Spice," and they have not found any "direct causality" between synthetic marijuana use and the "development of psychotic disturbances."  (***Id.* at 85:6-23, 88:16-22, 90:14 – 91:5, 106:16 – 107:03, 123:16 – 124:11**)  Yet, his ultimate conclusions based solely on that literature is that synthetic marijuana caused aggression and violence in Christopher Torres that resulted in the justified use of force of shooting him three times in the back.  (***Id.* at 82:4-13, 91:10-16**)

Ultimately, Dr. Fisher's theory is based on conjecture, not on sound, scientific principles.  Such guesswork is not the type of opinion testimony that is contemplated as sufficient to meet the demands of Rule 702.  The *Daubert* standard was refined for the very purpose of preventing unreliable, unsupported testimony like that of Dr. Fisher from factoring into the fact-finder's decision-making process.

### III.  ANY PROBATIVE VALUE OF DR. FISHER'S OPINIONS REGARDING THE BEHAVIORAL EFFECTS OF SYNTHETIC MARIJUANA AND ARIPIPRAZOLE IS SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE

Under Rule 403, even if an expert is determined to be qualified and his/her testimony is relevant to the issues of the case, the inquiry regarding admissibility does not end there.  The expert's testimony may still "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice…or by considerations of…[the] needless presentation of cumulative evidence."  Rule 403.  The most common application of Rule 403 is to exclude unfairly prejudicial evidence, including expert testimony.  *See United States v. Brown*, 540 F.2d 1048, 1054 (10th Cir. 1976).  Oftentimes, the implementation of the Rule 403 balancing test depends upon the totality of the evidence offered by one party against another.  *See id.*  If the expert's opinion is not corroborated by any other evidence, its potential to unfairly prejudice the jury overshadows any probative value that may remain.  *See id.*

As explained above, Dr. Fisher's proposed testimony is not only outside his area of expertise, but it is also propped up by unreliable conjecture.  There exists no concrete corroborating evidence to which he is able to point to support his theory that Christopher Torres' behavior was affected in any way by being under the influence of synthetic marijuana or by not having taken his prescribed Aripiprazole.  What the City is hoping to do by presenting Dr. Fisher's testimony is to paint the picture to present Christopher as having been in such a state of violent psychosis at the time of his encounter with Detictives Brown and Hilger that they had no choice but to kill him.  He seeks to do so by explaining that the supposed influences synthetic marijuana and lack of Aripiprazole had on Christopher were akin to a violent methamphetamine-induced rampage.  **(Ex. D, Fisher Depo. at 45:24 – 46:03, 58:14 – 61:21)**  No actual evidence

9

supports this theory, and allowing Dr. Fisher to present it at trial would do little more than confuse the issues and result in unfair prejudice to Plaintiff.

## CONCLUSION

Plaintiff respectfully requests that the expert testimony of Dr. Don Fisher, M.D. be excluded in its entirety. Dr. Fisher is not qualified to testify as a psychiatrist, his opinions rest solely on a foundation of unreliable medical literature, and allowing his opinions to be included in the Court's decision-making process as the fact-finder would result in unfair prejudice. If Dr. Fisher's testimony is not excluded based solely on the present briefing, Plaintiff would additionally request that the Court schedule a *Daubert* hearing at which his qualifications and the reliability of his opinions could be further tested.

Plaintiff further requests that the City reimburse him for expense of Dr. Fisher's hourly-rate billing for his deposition—$3,623.29 (5.25 hours at $645 per hour + 7.0% sales tax).

Respectfully submitted,



**/s/Tyler J. Atkins**
Tyler J. Atkins
Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Counsel for Plaintiffs
201 Broadway Blvd., SE
Albuquerque, NM 87102
Phone: (505) 843-6161
Fax: (505) 242-8227

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing pleading was served upon all counsel of record via electronic mail on this the 30th day of January, 2014. Furthermore, I caused the foregoing to be electronically filed through the Second Judicial District Court Odyssey File & Serve system, which caused all counsel of record to be served by electronic means:

    Luis E. Robles
    Robles, Rael & Anaya, PC
    500 Marquette Ave NW, #700
    Albuquerque, NM 87102
    luis@roblesrael.com

    W. Ann Maggiore
    Butt, Thornton & Baehr, PC
    P.O. Box 3170
    Albuquerque, NM 87190
    wamaggiore@btblaw.com


*/s/ Tyler J. Atkins*
Tyler J. Atkins