IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

**STEPHEN TORRES, as Personal Representative
of the Estate of CHRISTOPHER TORRES, deceased,**

      Plaintiff,

v.                                          **No. CIV 12-1048 RB/KBM**

**CITY OF ALBUQUERQUE**, ex rel.
**ALBUQUERQUE POLICE DEPARTMENT;
CHRISTOPHER BROWN; and
RICHARD HILGER**,

      Defendants.

## PLAINTIFF'S MOTION FOR ISSUE PRECLUSION
## AGAINST DEFENDANT CITY OF ALBUQUERQUE

Plaintiff Stephen Torres, as Personal Representative of the Estate of Christopher Torres, deceased, through his attorneys, McGinn, Carpenter, Montoya & Love, P.A., respectfully moves the Court to apply the doctrine of Issue Preclusion on compensatory damages against Defendant City of Albuquerque, ex. rel. Albuquerque Police Department because:

    1. At a bench trial originally agreed to by the City, District Court Judge Shannon Bacon ruled against the City on the state Tort Claims Act claims[1] and determined the amount of compensatory damages for Christopher Torres' wrongful death; and

    2. The City had a full and fair opportunity to litigate the issue of compensatory damages for the wrongful death of Christopher Torres and should not be allowed two bites at the damages apple.

Plaintiff contacted counsel for the City to obtain the City's position on this motion. Plaintiff received no response. Due to the nature of the motion, Plaintiff presumes the City's Opposition.

---

[1] Judge Bacon specifically did not rule on the federal claims but reserved them for this Court.

1

## BACKGROUND

### The Shooting Death of Christopher Torres on April 12, 2011

On April 12, 2011, Christopher Torres was relaxing in the backyard of his Albuquerque home in his pajamas with his dog when two men (depicted here as they appeared the day of the incident) approached the backyard fence to talk to him.



Richard Hilger



Chris Brown - Shooter

Within seconds of approaching Christopher Torres, the two men started a fight with the unarmed Mr. Torres—Chris Brown by jumping the fence, Richard Hilger by tearing down an entire panel of the fence and running through the hole. The men tackled Mr. Torres and took him to the ground. Mr. Torres ended up face down on all fours. Chris Brown jumped onto Mr. Torres' back and was trying to pull his arms back to handcuff them. Richard Hilger was standing on Mr. Torres' right side, punching him over and over again in the face. To get Mr. Torres to do what he wanted, Hilger stopped punching, pulled out his gun, and threatened to shoot Mr. Torres.

These events were witnessed by a neighbor who heard the commotion and watched through a hole in the back fence. The neighbor, Christie Apodaca, did not know these were APD undercover officers; she thought her neighbor was being mugged by two thugs. After she heard one of the men who she thought was robbing her neighbor yell, "I'm going to shoot you, I'm going to shoot you," Ms. Apodaca ran to her house to call 911.

Officer Chris Brown then pulled out the pistol at his waist, put the barrel into Mr. Torres' back, and shot Christopher Torres twice, leaving the imprint of the barrel in Christopher Torres' skin. After a brief pause, the detective lined up his pistol and fired a third, fatal shot into Christopher Torres' back, killing him in his own back yard.

These two plain-clothes APD detectives were at the Torres home conducting an investigation into a traffic-related incident that had occurred two months earlier. These two officers had conducted no background investigation into Christopher, so they did not know that he suffered a mental illness—a fact which was readily available in APD's own records. *See* **Exhibit 1**, State District Court's Findings of Fact and Conclusions of Law, ¶ 8. Under APD's own Standard Operating Procedures (SOPs), had they known that he was suffering from a mental illness, they would have been required to approach the situation differently and should have called for assistance from a specially trained officer who had been assigned to Christopher Torres at his parents' request. *See id.* ¶¶ 8a, b, and c; ¶¶ 9-12.

After shooting Mr. Torres to death, the detectives realized they had no lawful reason for shooting Mr. Torres. Unaware of the eye-witness, the detectives made up a story about Mr. Torres having grabbed Hilger's weapon and Brown having to shoot to protect them both.

APD had one of its own officers investigate the shooting death of Christopher Torres in his own backyard. APD did not investigate this incident as a homicide or as a shooting of a

citizen. Based upon the false story concocted post-shooting by Hilger and Brown, it investigated the case as an assault on two police detectives by the citizen who was shot and killed.

APD policy at the time required officers serving warrants to tape or video record their encounters. Even though both officers had been issued digital audio and video recording devices, neither produced a recording of the shooting as required by the SOP. *See id.* ¶ 30. No one from APD interviewed the eye witness neighbor, who had immediately called 911 and whose call to 911 was recorded by APD.

APD apparently had the pistol tested for fingerprints, and Mr. Torres' fingerprints were not on the gun, even though the gun was an ideal surface for transfer of fingerprints. *See id.* ¶¶77-79. APD also had the pistol tested for DNA—albeit in a manner completely contrary to protocol such that the results are suspect—and, not surprisingly, found transfer DNA on the gun which would have come from Hilger's fist, with which he had bloodied Mr. Torres' face before pulling out his gun. APD DNA testing also found the DNA of Richard Hilger and a third, unknown individual. *See id.* ¶¶ 71-76, 80.

Without fully investigating the incident and without uncovering the truth that the lawsuit in this matter would ultimately lead to, APD concluded that Richard Hilger and Chris Brown's act of killing Christopher Torres—as well as the decisions and actions leading up to it—were justified. Neither officer was charged or disciplined for his conduct in the killing.

**State Court Trial – March 2014**

The City originally agreed to a bench trial before the Honorable Shannon Bacon on the plaintiff's negligence claims against the City under the New Mexico Tort Claims Act. The City never moved to consolidate the state court case with the separately filed federal action for claims under 42 USC § 1983 and the Americans With Disabilities Act.

The bench trial before Judge Bacon on the state claims lasted approximately a week. Plaintiff proved at trial that the physical evidence recovered at the scene of Christopher Torres' death was inconsistent with the stories of the two detectives who killed him. *See, e.g., id.* ¶¶ 81, 82. Plaintiff presented the recorded deposition testimony of those two detectives, much of which demonstrated inconsistencies within and between the two detectives' stories. On the issues of compensatory damages for the wrongful death of Christopher Torres, Plaintiff presented the testimony of family members, an employer, and expert evidence from an economist, Brian McDonald, PhD., that supported Plaintiff's claim for significant financial damages suffered by Christopher Torres' estate as a result of his death.

No representative from the City of Albuquerque or APD attended the trial. APD called no witnesses to rebut the economic damages suffered as a result of the death of Christopher Torres.

After post-trial briefing on various issues, the district court entered its findings of fact and conclusions of law. The court found that there was no credible evidence that Christopher Torres grabbed the detective's gun. *See id.* ¶ 84. The court found that there were many important inconsistencies in the testimony of the two detectives and that their testimony was not credible. *See id.* ¶¶ 82-83. The court found that neither detective was acting in self-defense or defense of another when they attacked and killed Christopher Torres. *See id.* ¶¶ 85, 86. Finally, the court found that the actions of the detectives caused the death of Christopher Torres and the damages he suffered. *See id.* ¶ 87, 90. The district court concluded that the compensatory damages as a result of the wrongful death of Mr. Torres were $6,018,385.82 and that the City of Albuquerque is liable to Plaintiff for his damages. *See id.* ¶ L.

## ARGUMENT

The Full Faith and Credit Clause of the United States Constitution requires individual states to respect the "public acts, records and judicial proceedings of every other state." United States Constitution, Art. IV, Section 1. In order to ensure that the Clause would not be misunderstood to suggest that federal courts are free to ignore the judgments of state courts, one of the first laws Congress passed was the Full Faith and Credit Statute, 28 U.S.C. § 1738, which "required all federal courts to give preclusive effect to state-court judgments whenever the courts from which the judgments emerged would do so." *Allen v. McCurry*, 449 U.S. 90, 96 (1980). When a federal court considers the preclusive effect of a state court judgment on a pending federal case, it must apply the law of the state where the issues were litigated and decided. *See Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985).

I. **The New Mexico Doctrine of Issue Preclusion Applies to the State Court's Finding of Compensatory Damages so that Compensatory Damages Need Not be Re-litigated.**

Under the New Mexico Doctrine of Issue Preclusion, the compensatory damages for the wrongful death of Christopher Torres have already been fully litigated by Defendant City of Albuquerque and that defendant should not be allowed to re-litigate the issue of damages in this case. If the City is found liable on the federal claims under 42 U.S.C. 1983 in this case, it should be liable to pay compensatory damages of $6,018,385.82 for the wrongful death of Mr. Torres. Additional damages may be awarded by the jury for punitive conduct.

In New Mexico, the doctrine of Issue Preclusion—also called "collateral estoppel"—prevents a party from re-litigating ultimate facts or issues that were actually and necessarily decided against it in a prior suit. *See Deflon v. Sawyers*, 2006-NMSC-025, ¶13, 139 N.M. 637, 137 P.3d 577. The party moving for issue preclusion "must show that (1) the subject matter or

6

causes of action in the two suits are different, (2) the ultimate fact or issue was actually litigated, (3) the ultimate fact or issue was necessarily determined, and (4) the party to be bound by [issue preclusion] had a full and fair opportunity to litigate the issue in the prior suit." *Hyden v. McCormick*, 1993-NMCA-008, ¶ 14, 115 N.M. 159, 848 P.2d 1086.

The doctrine may be used defensively or offensively; that is, a defendant may seek to prevent a plaintiff from re-litigating an issue the plaintiff previously litigated and lost, or a plaintiff may seek to prevent a defendant from re-litigating an issue the defendant previously litigated and lost, as Plaintiffs propose here. *See Reeves v. Wimberly*, 1988-NMCA-038, ¶ 11, 107 N.M. 231, 755 P.2d 75. The party seeking application of the doctrine does not have to have been a party to the previous action in order to preclude re-litigation of an issue against a party who lost on that issue in the previous action. *See id.* ¶ 12, 107 N.M. at 234, 755 P.2d at 78 (explaining that New Mexico has adopted the "modern view of mutuality, dispending with the 'same parties' requirement of [common law] collateral estoppel."). For example, if Plaintiff were to prevail on his *Monell* claim in this case and prove that the Albuquerque Police Department has a pattern and practice of violating citizens' rights through use of excess force, every person who subsequently sues the City could move for Issue Preclusion on that issue and have it conclusively established for the relevant time period without the need for presenting further evidence. The pattern and practice of APD could not be re-litigated, and trials on those claims would be limited only to causation and damages.

Once a trial court determines that issue preclusion most likely applies, it must consider "whether countervailing equities such as lack of prior incentive for vigorous defense, inconsistencies, lack of procedural opportunities, and inconvenience of forum militate against application of the doctrine." *Hyden*, 1993-NMCA-008, ¶14, 115 N.M. 159, 848 P.2d 1086.

**II.     The City had a Full and Fair Opportunity to Litigate the Compensatory Damages for the Wrongful Death Christopher Torres in the State Case.  Issue Preclusion Applies and Damages Need not be Re-litigated.**

When a court in a prior proceeding makes a final determination of a fact that is necessary for resolution of that case, Issue Preclusion allows the prevailing party to conclusively establish that fact in a subsequent proceeding against the party who lost, even if the parties in the subsequent proceeding are different or lack privity.  In *Reeves*, the New Mexico Court of Appeals evaluated a district court's granting of summary judgment against the plaintiff in a civil conspiracy case.  *See Reeves*, 1988-NMCA-038, ¶4, 107 N.M. 231, 755 P.2d 75.  Minnie Reeves had been the leaseholder of property owned by Ira Miller; the lease was extended once, up to September 30, 1985.  *See id.* ¶2.  After September 30, 1985, Miller leased the property to James Wimberly, but Reeves refused to vacate it and claimed that she and Miller had orally extended the lease to 1987.  *See id.* ¶2.  Miller filed an action in forcible entry and unlawful detainer, and the district court found that the two had never extended the lease to 1987 as Reeves claimed.  *See id.* ¶ 3.

Reeves then filed a suit against both Miller and Wimberly for conspiracy to defraud her out of her interest in the leased property.  *See id.* ¶ 4.  Miller moved for summary judgment based on issue and claim preclusion.  *See id.* The district court granted the motion, concluding that Reeves' action depended upon a factual determination that she actually held an extended lease to be defrauded out of, and because the district court in the previous case had found that she did not have such a lease, issue preclusion prevented re-litigation of that issue.  *See id.* ¶ 5.

In reviewing that decision, the Court of Appeals considered first whether the issue of the existence of a lease extension—which was obviously necessary in the forcible entry action—was also necessary in the conspiracy action, which would make the lease issue common to both

8

proceedings. *See id.* ¶ 19. The Court concluded the existence of the lease was necessary in the conspiracy claim because the harm she claimed she suffered—the ability to sell the extended lease she claimed she possessed—depended upon actually having the lease. *See id.* ¶ 19. Thus, the issue was common to both proceedings. *See id.* ¶ 19. Next, the court considered whether the previous case had afforded Reeves the opportunity to fully litigate that issue and concluded that it had, saying "Reeves clearly had an incentive for vigorous defense, which was the prevention of the termination of her leasehold interest." *See id.* ¶¶ 20, 24. Finally, the court considered whether the issue of the existence of the lease had been actually and necessarily determined by the prior action. *See id.* ¶ 22. Noting that the court in the earlier proceeding had found after a trial on the merits that the lease had been terminated and the extension did not exist as Reese claimed, the Court of Appeals concluded that the issue of the lease extension had been actually and necessarily determined in the prior proceeding. *See id.* ¶ 22. Importantly, the Court noted that the addition of a new party in the subsequent action had no bearing on the matter. *See id.* ¶ 24 (explaining that "[t]he mere addition of Wimberly as a party in the second suit did not provide Reeves with any procedural opportunities involving the issue concerning the alleged lease extension."). The Court of Appeals concluded Issue Preclusion applied and affirmed the district court. *See id.* ¶¶ 25-26.

Applying New Mexico's four-part test for Issue Preclusion leads to the conclusion that the City may not re-litigate the issues of damages in this case.

The first factor looks at whether the issue to be precluded is the same in two separate causes of action. While there are different legal issues to be decided in the federal case (e.g., punitive damages, violation of civil rights, ADA claims, *Monell* claims and APD's pattern and

practice for the use of excessive force), the issue of the compensatory damages for the wrongful death of Christopher Torres is the same.

Factor two—whether the issue of damages was actually litigated—prevents re-litigation of the issue. Plaintiff presented evidence at trial about the value of Mr. Torres' life from family members, an employer, and an expert economist who established the damages suffered by Christopher Torres' estate as a result of his wrongful death. Counsel for the City cross-examined that expert witness. Perhaps most importantly, the first motion *in limine* the City filed was to limit testimony and evidence related to damages in the state case. *See* **Exhibit 2**, first page of City's *Daubert/Alberico No. 1, Exclusion of Benchmark Figures for lost Household Services and lost Value of Pleasure of life by Plaintiff's Expert Economist Brian McDonald*.

The state case involved years of discovery, motions practice, and other pretrial litigation before it came before the state district court for a trial on the merits. The City had every opportunity to challenge the evidence presented by Plaintiff at trial—either through cross examination or by calling its own witnesses and presenting its own evidence. The City took some of those opportunities, and the City declined some of those opportunities. No one can say that it was not presented with plenty of ways and chances to litigate the state court case and the issue of damages. The issue of damages was not only actually litigated, it was vigorously litigated by both sides in the state case.

After hearing from both sides, the district court found that the batteries resulting in wrongful death caused Plaintiff damages in the amount of $6,018,385.82 and specifically concluded that compensatory damages in that amounts should be awarded against the City. *See* **Exhibit 1, ¶¶ 90, L**. Thus, the issue of compensatory damages was finally decided, so factor

three was met. Finally, the determination of compensatory damages was clearly necessary to the wrongful death case, so factor four is also met.

None of the equitable considerations that might bar application of Issue Preclusion exist in this case. The City cannot complain of the forum; it litigated this case in its "home town." The City cannot claim it lacked incentive to vigorously litigate the issue of damages. Nothing in the state case denied the City a procedure that should have been available to it. Finally, like in *Reeves*, the addition of new parties—in this case the two officers who killed Christopher Torres—provides the City with no new procedural opportunities and has no bearing on whether Issue Preclusion applies to the City.

Like in *Reeves*, the issue upon which Plaintiff seeks preclusion went to the core of a case that wound its way all the way from pretrial litigation to a final adjudication after a trial on the merits. Like the court in *Reeves*, this Court should conclude that Issue Preclusion applies here and preclude the City from re-litigating the issue of damages. Instead, should the jury find against the City on the federal claims, this Court should enter a verdict in the amount of $6,018,385.52 for compensatory damages for the wrongful death of Christopher Torres.

**III.    Issue Preclusion Applies Only Against the City, not the Individual Police Officers Unless They Voluntarily Choose Not to Re-litigate Damages.**

While *any* party may use Issue Preclusion against a party that lost on the applicable issue in a previous proceeding, the reverse is not true. No party may use Issue Preclusion against a party in a subsequent proceeding that was *not* a party in the previous proceeding. As New Mexico's Supreme Court has made clear, the "main concern" in determining whether Issue Preclusion applies is whether the party against whom Issue Preclusion is sought had "a full and fair opportunity to litigate the issue in the prior action." *See Deflon*, 2006-NMSC-025, ¶ 14.

11

While much of the evidence and testimony at trial in the state case concerned the Officer Defendants, they were merely witnesses and actors there. Plaintiff did not name them as defendants in the state case, so they were not parties. Because they were not parties, they had no legal opportunity to litigate the issue of damages, let alone a full and fair opportunity to do so. For that reason, Issue Preclusion cannot apply to the Officer Defendants. Instead, Plaintiff seeks to apply Issue Preclusion only against the City and will argue to the jury that it should award the higher amount of compensatory damages the Plaintiff requested during the bench trial. However, if the officers choose not to re-litigate the issue of damages in this case, they may stipulate to damages in the amount previously found in state court.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully moves this Court to apply the doctrine of Issue Preclusion against Defendant the City of Albuquerque, prevent the City from re-litigating the issue of damages, and, should the federal jury find for the Plaintiff after trial, enter a finding against the City that Plaintiff suffered damages in the amount of $6,018,385.52 as found by the district court in the state case.

Respectfully submitted,



**/s/Randi McGinn**
Randi McGinn
Kathleen J. Love
Kevin P. Holmes
McGinn, Carpenter, Montoya & Love, P.A.
Counsel for Plaintiffs
201 Broadway Blvd., SE
Albuquerque, NM 87102
Phone: (505) 843-6161
Fax: (505) 242-8227

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing pleading was served upon all counsel of record via electronic mail on this the 17th day of December, 2014.  Furthermore, I caused the foregoing to be electronically filed and served through the CM/ECF system:

>Luis E. Robles
>Robles, Rael & Anaya, PC
>500 Marquette Ave NW, #700
>Albuquerque, NM 87102
>luis@roblesrael.com
>
>W. Ann Maggiore
>Butt, Thornton & Baehr, PC
>P.O. Box 3170
>Albuquerque, NM 87190
>wamaggiore@btblaw.com

*/s/ Kevin P. Holmes*
Kevin P. Holmes