Case 1:12-cv-01048-RB-KBM   Document 211-1   Filed 12/17/14   Page 1 of 20

FILED IN MY OFFICE
DISTRICT COURT CLERK
6/10/2014 10:46:44 AM
GREGORY T. IRELAND
Lorenzo Renteria

SECOND JUDICIAL DISTRICT
COUNTY OF BERNALILLO
STATE OF NEW MEXICO

STEPHEN TORRES, as Personal Representative
of the Estate of CHRISTOPHER TORRES, deceased,

 Plaintiff,
v.             No.  D-202-CV 2011-06551

CITY OF ALBUQUERQUE, *ex rel.* ALBUQUERQUE
POLICE DEPARTMENT,

 Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court's decision, after a trial on the merits March 10 to 14, 2014, is set forth below.  Any requested findings of fact or conclusions of law not included in this decision are deemed refused, immaterial to the Court's decision, or subsumed by these Findings of Fact and Conclusions of Law.  This Court is not considering or deciding the following matters which are reserved for decision in the parallel federal case:  (A)  whether, under federal law, the force used by Detectives Christopher Brown and Richard Hilger was appropriate; (B)  whether the acts or omissions of the Albuquerque Police Department ("APD") and/or Detectives Brown and Hilger violated Christopher Torres' constitutional rights under 42 U.S.C. §1983; (C)  whether APD had or condoned an official policy, custom, or practice of unconstitutional misconduct by its employees; (D)  whether APD management exhibited deliberate indifference to or tacit approval of unconstitutional misconduct or use of excessive force by its officers; (E)  whether APD management exhibited deliberate indifference in its hiring of Detective Brown; (F)  whether Detective Brown was highly likely to shoot a citizen based on his background; (G)  whether the training and supervision by APD management rose to the level of deliberate

Exhibit 1

indifference; (H) whether the acts of APD violated the provisions of the Americans with Disabilities Act; (I) whether Detectives Brown and Hilger acted recklessly and with utter indifference to the consequences so as to give rise to punitive damages; and (J) the amount of punitive damages, if any. In addition, these Findings of Fact and Conclusions of Law do not address procedural requests raised in Plaintiff's proposed findings of fact and conclusions of law.

## **FINDINGS OF FACT**

Events of April 12, 2011

1. On April 12, 2011, Detectives Brown and Hilger went to the Torres home with a felony arrest warrant for Christopher Torres.

2. It is unclear whether the Detectives intended to serve the warrant and arrest Christopher Torres or to take a statement from Christopher Torres. At various times, the Detectives have testified to both.

3. The arrest warrant was issued as a result of a road rage incident that occurred on February 16, 2011.

4. The arrest warrant was issued at least a week prior to the Detectives arriving at the Torres home.

5. There were no exigent circumstances on April 12, 2011, which required the Detectives to execute the warrant or take a statement at that date and time. They could choose the date, time and place of their encounter with Christopher Torres.

6. Prior to their attempt to execute the warrant, Detectives Brown and Hilger had done little to learn about Christopher Torres' background.

7. The Detectives did not make adequate inquiry into the facts underlying the warrant.

8. Before contacting Christopher Torres, Detective Brown did not do an adequate investigation to obtain the information that was available in APD's own records, as evidenced by Detective Paige Lavilla obtaining all the information below within 24 hours of the shooting. Had any investigation occurred the Detectives would have learned that:

- A. Christopher Torres was suffering from the disease of schizophrenia and was currently undergoing a competency evaluation for that illness;

- B. APD Crisis Intervention Trained (CIT) officers had successful, nonviolent encounters with Christopher Torres in the past;

- C. Christopher Torres' parents, Steve and Renetta Torres, had met with APD and requested that they be contacted if officers needed to have any contact with their son so they could ensure his cooperation;

- D. Christopher Torres had been assigned a CIT officer, Xavier Lopez, who was supposed to be the APD liaison with Christopher Torres.

9. When Detective Brown encountered Christopher Torres, he did not recognize that Christopher Torres' confusion, questions, and affect may have been a result of a mental illness, rather than being a sign of disrespect or "contempt of cop".

10. Had the Detectives learned of Christopher Torres' mental health, they would have been required to take certain precautions when interacting with Christopher Torres. Specifically, APD's Standard Operating Procedures would have required

backup officers to be present and communication with Christopher Torres' family prior to their encounter with him.

11. In addition, APD's Standard Operating Procedures, would have also called for the Detectives to approach Christopher Torres slowly, in a quiet, non-threatening manner, providing words of reassurance and not threatening Christopher Torres with arrest or physical harm.

12. Prior to making contact with Christopher Torres, the Detectives did not make contact with Christopher Torres' family or his assigned CIT officer.

13. The Detectives arrived at the Torres home dressed in plain clothes and driving an unmarked vehicle. The Detectives' guns and badges were not visible, but were underneath their clothing.

14. Detective Hilger's gun was hidden in his inside-the-pants holster under a long t-shirt.

15. The Detectives attempted to gain the attention of a resident of the Torres home by ringing the doorbell. However, there was no response.

16. Detective Hilger then heard noise coming from the Torres' side yard.

17. The Detectives approached the fence between the Torres' front yard and the side yard where they saw a man matching Christopher Torres' description standing in the yard in his pajamas, socks, and slippers.

18. The Detectives testified that they identified themselves as police officers and told Christopher Torres that they had a warrant.

19. The Detectives did not present Christopher Torres with a copy of any warrant for his arrest.

20. Christopher Torres responded that it was not possible he was in his back yard.

21. While the Detectives were talking to Christopher Torres he was holding a broom stick.

22. Christopher Torres put down the broom stick.

23. The Detectives testified that Christopher Torres was not being cooperative with the officers. Christopher Torres would not consent to being arrested or to being interviewed by the officers.

24. Christopher Torres told the officers that he had not done anything wrong.

25. The Detectives never told Christopher Torres they were there investigating a traffic incident which had occurred almost two months earlier.

26. On April 12, 2011, the Detectives never questioned Christopher Torres about that incident.

27. Detective Hilger asked Christopher Torres to come to the front yard to talk to the officers.

28. Christopher Torres did not comply with the request and took one step back, away from the fence.

29. Detectives Brown and Hilger's testimony is inconsistent with the eye witness's testimony and the physical evidence.

30. The Detectives did not record these events with their lapel cameras. The Detectives testified that they did not take their lapel cameras with them to the Torres residence that day.

Detective Brown's trial deposition testimony

31.     Detective Brown testified that it was then necessary to jump over the fence. This escalated the encounter.

32.     Detective Brown testified that upon jumping over the fence he removed his handcuffs from their case and began walking toward Christopher Torres. He told Christopher Torres he was under arrest. He testified that Christopher Torres raised his hand as if to hit Detective Brown, but Detective Brown hit him first.[1]  Detective Brown and Christopher Torres then fell to the ground, with Christopher Torres landing on his back and Detective Brown landing on top of Christopher Torres. Detectives Brown and Hilger then flipped Christopher Torres on to his stomach.

33.     Detective Brown testified when he fell, he was on top of Christopher Torres and that Christopher Torres had both of his hands under his chest. Detective Brown testified that as he was lying across Christopher Torres' body, he wrapped his right leg around Christopher Torres' right leg in a grapevine hold. Detective Brown then began to wrestle for control of Christopher Torres' left arm.

34.     Detective Brown also testified that initially Detective Hilger was on Christopher Torres' left side, but then Detective Hilger moved to Christopher Torres' right side and was trying to gain control of Christopher Torres' right arm.

35.     At some point, Detective Brown lost his handcuffs. He then mistook the glint of metal from his own dropped handcuffs as a knife. He yelled out, "He's got a knife."

36.     Christopher Torres yelled out that he did not have a knife.

---

[1] In contrast, in his initial interview with the APD investigating officer, Paige Lavilla, Detective Brown stated Christopher Torres punched him in the nose prior to Detective Brown hitting Christopher Torres.

37. Christopher Torres was also yelling, "I'm a good guy. This is my house."

38. Detective Brown testified that the scuffle continued until he heard Detective Hilger say "let go of my gun, let go of my gun". Detective Hilger said he lifted up and he saw Detective Brown hitting Christopher Torres in the face. Detective Brown let go of Christopher Torres' left arm and saw Christopher Torres' right hand and arm above Christopher Torres' head, holding Detective Hilger's gun. Detective Brown says Christopher Torres' right arm was unchallenged, and he was waiving his arm around with Detective Hilger's gun in his hand. Detective Brown testified that Detective Hilger did not have his hands on Christopher Torres' arms, pinning Christopher Torres' arms to the ground.

39. Detective Brown says that he heard Detective Hilger say "he's got my gun, shoot him, shoot him." He also saw Christopher Torres raise his right forearm up and point the barrel of the gun in the direction of Detective Hilger's head.

40. Detective Brown then unholstered his gun, pointed it at Christopher Torres' lower back and shot Christopher Torres two times in short succession. After the two shots, Christopher Torres and Detective Hilger both had hands on Detective Hilger's gun and were wrestling for it. Detective Brown testified that Christopher Torres then went up on his hands and knees, and Detective Brown shot Christopher Torres in the upper back. At the time of the third shot, Detective Brown testified that his gun was about a foot away from Christopher Torres' back (although it left a contact burn on Christopher Torres' back). After this shot, Christopher Torres collapsed with his hands underneath his body.

41. Detective Brown then located his handcuffs underneath Christopher Torres' body, and he handcuffed Christopher Torres' arms behind his back.

42. A period of time then passed between handcuffing Christopher Torres and responding officers arriving at the scene.

Detective Hilger's trial deposition testimony

43. Detective Hilger testified that he had his gun on his right hip, secured by an inside-the-pants tension holster. The gun was further hidden underneath a long t-shirt.

44. After Detective Brown jumped over the fence, Detective Hilger immediately removed a section of the fence, entered the backyard, and tackled Detective Brown and Christopher Torres, taking them both to the ground.

45. Detective Hilger testified that as he went to tackle Detective Brown and Christopher Torres, Christopher Torres hit him in the nose. Detective Hilger described the contact as a "glancing blow" and that he was not injured by it.[2]

46. After tackling Christopher Torres to the ground, Detective Hilger testified that Christopher Torres was face down on the ground and Detective Brown was on top of Christopher Torres.

47. Detective Hilger was trying to get control of Christopher Torres' right arm.

48. When Detective Hilger heard Detective Brown yell, "He has a knife", Detective Hilger was able to pull Christopher Torres' right hand out from underneath his body and thereby confirm that Christopher Torres did not have a knife.

---

[2] In his sworn interview with APD investigating officer, Paige Lavilla, Detective Hilger stated that after the punch he was bleeding from his nose.

49. Detective Hilger then secured Christopher Torres' right arm by kneeling on it with his body weight.  At that point, Detective Hilger either reached for his handcuffs, only to discover his handcuffs were not in their case, or his radio.  In his testimony, Detective Hilger vacillated on this point.

50. Detective Hilger testified that when he reached for either his handcuffs or radio, Detective Brown was still lying on top of Christopher Torres.

51. Detective Hilger then testified that Christopher Torres grabbed Detective Hilger's gun.  Detective Hilger tried to keep the gun from coming completely out of its holster, but failed.

52. Detective Hilger ordered Christopher Torres to let go of his gun and then yelled out "He's got my gun.  He's got my gun."

53. Detective Hilger then began punching Christopher Torres on the right side of Christopher Torres' face as hard as he could in an attempt to subdue him.  Detective Hilger testified that he only hit Christopher Torres with his right hand.

54. Detective Hilger testified that he then grabbed Christopher Torres' right arm and pinned it to the ground.  Christopher Torres' right arm was out in front of him, above his head, on the ground, which was covered in gravel.

55. Christopher Torres then reached up with his left hand and grabbed the barrel of the gun by the front slide.  Christopher Torres had both of his hands on the gun (one on the slide and one on the grip), and Detective Hilger grabbed both of Christopher Torres' arms and held them to the ground.

56. Detective Hilger testified that Christopher Torres never pointed the gun directly at either Detective. He testified that the gun was pointed at the back fence between the Torres property and the Apodaca property.

57. Detective Hilger then shouted for Detective Brown to shoot Christopher Torres.

58. Detective Hilger testified that he could sense Detective Brown getting up and then he heard two shots in quick succession. He testified that there was a pause and then Detective Brown, from a short distance, shot Christopher Torres for a third time in his upper back.

59. Detective Hilger testified that at the time of the shooting, he had both of Christopher Torres' arms pinned to the ground and that Christopher Torres was still on his stomach, on the ground.

60. After the third shot, Detective Hilger took his gun and holstered it.

Trial testimony of Christie Apodaca

61. Backyard neighbor and eyewitness Christie Apodaca heard a commotion from her back yard, which is directly behind the Torres' home. She testified that she heard a man, which she later identified as Christopher Torres, yelling, "This is my house; this is my backyard." She looked through the fence between her backyard and the Torres backyard, where she saw a man on Christopher Torres' back (Detective Brown) and another man (Detective Hilger), standing to his right side, punching Christopher Torres over and over again in the face.

62. She further testified that Christopher Torres was not fighting back.

63. There was nothing to indicate to Ms. Apodaca that these two men were police officers, and she believed her neighbor was being mugged and beaten.

64. Ms. Apodaca then testified that the man she saw punching Christopher Torres (Detective Hilger) pulled out a handgun, pointed it at Christopher Torres, and said, "I'm going to shoot you." She then ran inside her house to call 911 for help.

65. Ms. Apodaca said that at the time Detective Hilger pulled out his gun, Christopher Torres was not threatening the officers.

66. As Ms. Apodaca was dialing the phone to call 911, she heard gunshots—two quick shots, a pause, and then a third shot.

The physical evidence

67. At the time of the alleged struggle for the gun and the shooting, Christopher Torres' head and hands were in a bed of rocks. His torso and lower body were on a concrete slab.

68. Despite the testimony about the struggle over Detective Hilger's gun and Detective Hilger pinning the gun down with his left hand in the rocks above Christopher Torres' head, there were no scratches or any damage on Detective Hilger's gun.

69. Christopher Torres' hands only showed defensive wounds. Christopher Torres' hands did not show injuries consistent with punching someone or any scratches indicating a struggle over the gun in the rocks above Christopher Torres' head.

70. Detective Hilger had offensive injuries on the knuckles of both of his hands, inconsistent with his testimony that he was only hitting Christopher Torres with his right hand. In addition, post mortem, Christopher Torres had significant swelling and bruising on both sides of this face.

71. When additional officers arrived at the scene, Detective Hilger's gun was found in his holster and not next to Christopher Torres' body.

72. The gun was not packaged and sent to evidence.

73. In violation of APD procedure, Detective Hilger then took the gun home and did not turn it in to the APD DNA analyst until the day after the shooting. Detective Hilger delivered his gun to the APD DNA analyst in an unsealed plastic bag.

74. Upon testing, the APD DNA analyst found Detective Hilger's and Christopher Torres' DNA on the gun, as well as DNA of an unknown third party.

75. The analyst did not conduct further testing to determine the source of Christopher Torres' DNA – blood, sweat, tears, skin, etc.

76. The analyst could not determine why Christopher Torres' DNA was on the gun (whether it was direct or indirect transfer).

77. A gun has a good surface for the transfer of finger prints.

78. Christopher Torres' fingerprints were not found on Detective Hilger's gun, even though it had a good surface conducive to obtaining finger prints.

79. APD failed to file an official report on fingerprinting Detective Hilger's gun.

80. There is no chain of custody for the gun prior to its delivery to the APD DNA analyst.

81. The non-existence of fingerprints on the gun is physical evidence inconsistent with the officers' testimony that Christopher Torres grabbed Detective Hilger's gun.

82. The testimony of the Detectives regarding the events of April 12, 2011 is inconsistent with each other, inconsistent with what Ms. Apodaca saw, and inconsistent with the physical evidence.

83. There are many inconsistencies in the testimony and evidence. The Court has highlighted the most significant of them. Based on the inconsistencies noted herein and others found in the testimony and evidence, the testimony of the Detectives is not credible.

84. There is no credible evidence that Christopher Torres grabbed Detective Hilger's gun out of the hidden, inside-the-pants holster, held it in a firing position, and threatened either of the Detectives.

85. Detective Hilger was not acting in self-defense or defense of another person when he punched Christopher Torres in the face.

86. Detective Brown was not acting in self-defense or defense of another when he shot Christopher Torres.

87. The battery and shooting by these APD officers was the immediate cause of the wrongful death of Christopher Torres.

88. The first two shots by Detective Brown were survivable and not fatal, but the third, delayed shot was not.

89. Christopher Torres did not die immediately. Instead, he endured a period of pain and suffering as he died.

90. As a result of the battery by Detectives Brown and Hilger, Christopher Torres and his Estate suffered the following damages:

    a.) Funeral expenses     $18,385.82

|      |                        |                                                          |
|------|------------------------|----------------------------------------------------------|
| b.)  | Future lost wages      | $ 65,564.00                                              |
| c.)  | Lost household services| $ 367,083.00                                             |
| d.)  | Lost enjoyment of life | $ 4,567,353.00 (exclusive of lost wages or household services) |
| e.)  | Pain and suffering     | $ 1,000,000.00                                           |

<u>Hiring, Training and Supervision</u>

91. Raymond Schultz was hired by Mayor Martin Chavez in April 2005 as the Chief of Police for the Albuquerque Police Department ("APD") and served in that job until his resignation on August 2, 2013.

92. At the time Chief Schultz was hired, APD had established hiring policies that required applicants to meet the following minimum standards to become a police officer:

   a. Have prior work experience, some college, and, preferably, a college degree;

   b. Submit to an extensive background check, which red flagged and rejected those with past financial problems, a criminal history, difficulty holding down a job, attitude problems, or anger management issues;

   c. Undergo a psychological evaluation to determine whether the applicant had anger management or other issues which made him or her a danger to the public; and

   d. Submit to a polygraph examination to determine the applicant's truthfulness or dishonesty.

93. These requirements applied to lateral hires as well as new applicants. Lateral hires from other police departments were disfavored and rigorously investigated, because APD did not want to take on another department's problem officers.

94. In late 2006, Mayor Chavez decided that APD should hire 100 new officers. To accomplish this goal, APD lowered the standards to become an APD officer, encouraging lateral hires, foregoing the extensive background investigation into lateral hires, and waiving any requirement that lateral hires undergo a psychological evaluation or polygraph examination by APD.

95. The change in APD's hiring standards, however, did not fall below the standards set by state law.

96. Prior to 2006, Detective Brown had been a certified police officer in Roswell.

97. After the standards were lowered, Detective Brown, who had been previously rejected by APD, re-submitted an application to become an APD officer. APD hired Detective Brown.

98. Detective Brown's hiring, however, met the standards set forth in New Mexico law.

99. The requirements that an applicant must meet in order to become a certified law enforcement officer in New Mexico are set by state statute.

100. The determination of whether an applicant has met those requirements is made by the New Mexico Law Enforcement Academy ("NMLEA") Board, an entity created by statute.

101. To qualify for certification as a law enforcement officer, an applicant must demonstrate to the NMLEA that he or she meets statutory requirements, including United States citizenship, minimum age, possession of a valid driver's license, lack of

felony convictions, lack of recent misdemeanor convictions in areas such as DWI, theft, or assault, and possession of good moral character.

102. In order to become a certified law enforcement officer, an applicant must pass a multi-faceted psychological examination administered by a certified psychiatrist. The components of the psychological examination, which includes a battery of standardized psychological tests, a face-to-face interview, and a written narrative report, are set by the New Mexico Administrative Code ("NMAC"), as are the rules regarding who may administer the examinations.

103. As long as a law enforcement officer has kept his or her certification in good standing, the NMAC does not require a follow-up psychological examination upon changing employers and does not require a police department or sheriff's office to request a follow-up psychological evaluation for a lateral hire.

104. Certification as a law enforcement officer is awarded by the NMLEA Board only after a candidate has demonstrated that he or she has met all of the requirements set out by statute and the administrative code.

105. Certification as a law enforcement officer may be revoked by the NMLEA Board for certain actions arising after certification, including being charged with a felony or being involved in misconduct involving moral turpitude.

106. A law enforcement agency may reasonably conclude that, if an applicant for a lateral position had previously been reported for engaging in any of the types of misconduct that could result in revocation or suspension of the officer's certification, a record of such a report would exist.

107. Detective Brown was hired pursuant to the State Regulations.

108. New Mexico statutes and the NMAC establish in detail the initial training that certified law enforcement officers must receive and the required curriculum is developed by the NMLEA Board. Although individual law enforcement agencies may require additional training, the minimum state-wide training standards are codified in the NMAC.

109. New Mexico statutes and the NMAC also establish in detail the continuing in-service training that an active certified law enforcement officer must receive. The contents of the in-service training that an officer must complete biannually are codified in the NMAC and the required curriculum is developed by the NMLEA Board. Although individual law enforcement agencies may require additional in-service training, the minimum state-wide training standards are established by law.

110. An officer certified in the state of New Mexico may be presumed to have received all training required by state statute and the NMAC, as such training is a condition of receiving and maintaining certification.

111. The Albuquerque Police Department training academy did not fail to meet the State standards for the quality and quantity of courses it was required to teach by the New Mexico Department of Public Safety.

## CONCLUSIONS OF LAW

A. The Court has jurisdiction over the parties and the subject matter.

B. On April 12, 2011, Detectives Brown and Hilger were acting in the course and scope of their employment with the City of Albuquerque, *ex rel.* Albuquerque Police Department.

C. Under New Mexico law, battery consists of "the unlawful, intentional touching

or application of force to the person of another, when done in a rude, insolent or angry manner." NMSA 1978, § 30-3-4 (1963). However, police officers are not liable for battery if they acted in good faith and did not use more force than reasonably necessary to preserve the peace or effect an arrest. *Alaniz v. Funk*, 1961-NMSC-140, ¶ 10, 69 N.M. 164.

      D.    Whether the use of force was objectively reasonable is determined by evaluation of the totality of the circumstances from the officer's perspective at the time of the incident. *See State v. Mantelli*, 2002-NMCA-033, ¶ 22, 131 N.M. 692.

      E.    The New Mexico Legislature has authorized the use of deadly force by a police officer when that officer has probable cause to believe he or another is threatened with serious harm or deadly force while performing lawful duties. NMSA 1978, § 30-2-6 (1989).

      F.    At all times pertinent to this case, Detectives Brown and Hilger were law enforcement officers acting within the scope of their duties.

      G.    The use of deadly force against Christopher Torres by Detective Brown was not objectively reasonable under the circumstances.

      H.    The unnecessary escalation of events by Detectives Brown and Hilger and their own aggressive acts at the Torres home created the unnecessarily dangerous situation in which Christopher Torres was shot to death.

      I.    Detective Hilger's beating of Christopher Torres constitutes a battery.

      J.    Detective Brown's takedown of Christopher Torres, grapevine control technique, and shooting him three times in the back at point blank range constitute a battery.

K. The batteries committed by Detectives Brown and Hilger caused the wrongful death of Christopher Torres.

L. Compensatory damages should be awarded against the City of Albuquerque, *ex rel.* Albuquerque Police Department for the wrongful death of Christopher Torres in the total amount of $6,018,385.82.

M. Negligent hiring, training or supervision is a derivative tort for purposes of the Tort Claims Act. Negligent hiring, supervision, or training alone is not sufficient to waive immunity under the Tort Claims Act. Instead, "negligence must cause a specified tort or violation of rights." *McDermitt v. Corrs. Corp. of Am.*, 1991-NMCA-034, ¶ 1, 112 N.M. 247. In order to recover for negligent hiring, training, or supervision, Plaintiff must prove both that Detectives Brown and Hilger committed a battery on Christopher Torres and that the battery was proximately caused by negligent hiring, training, or supervision.

N. To find negligent hiring, training or supervision under the New Mexico Tort Claims Act, all of the elements of negligence must have been proved, including duty, breach of duty, and proximate cause. *Schear v. Bd. of Cnty. Comm'rs of the Cnty. of Bernalillo*, 1984-NMSC-079, ¶ 21, 101 N.M. 671. Duty is a question of law, and, with respect to specifics of duty, "[p]olicy determines duty." *Torres v. State*, 1995-NMSC-025, ¶ 10, 119 N.M. 609. Where the legislature and executive agencies have spoken regarding a duty by creating policies, those policies should define the duty owed. *Id.*

O. State statutes and the New Mexico Administrative Code have set forth detailed standards regarding who may become and remain a certified law enforcement official and what training certified law enforcement officials must receive. These

statutes and regulations create the standard of care that law enforcement agencies in this state must meet in hiring, supervising, and training their officers.

    P.    Plaintiff has failed to prove that the City of Albuquerque breached any duties in hiring, training, and supervising Detectives Brown and Hilger.

    IT IS SO ORERED.

C. SHANNON BACON
DISTRICT COURT JUDGE