# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

STEPHEN TORRES, as Personal Representative
of the Estate of CHRISTOPHER TORRES,
deceased,

       Plaintiff,

v.                                     No. CIV 12-1048 RB/KBM

CITY OF ALBUQUERQUE, ex rel.
ALBUQUERQUE POLICE DEPARTMENT,
CHRISTOPHER BROWN, and RICHARD
HILGER,

       Defendants.

## MEMORANDUM OPINION AND ORDER

Plaintiff's son, Christopher Torres, died during an altercation with two Albuquerque Police Department Officers.  Plaintiff, acting as the personal representative of his son's estate, filed this action claiming that Defendants violated his son's rights under the Constitution and the Americans with Disabilities Act.  Defendants filed six motions for partial summary judgment, attacking all of Plaintiff's claims.  (Docs. 104-09.)  Having reviewed the parties' submissions and arguments, the Court **DENIES** Defendants' motions for summary judgment on the Americans with Disabilities Act claim, the excessive force claim, the Section 1983 unlawful custom claim, and inadequate supervision claim.  The Court **GRANTS** Defendants' motions for summary judgment on the Section 1983 inadequate hiring and training claims.  Finally, the Court **STRIKES** Plaintiff's inadequate supervision claim because it is redundant in light of Plaintiff's unlawful custom and practice claim.

## I.      BACKGROUND

In the spring of 2011, Albuquerque Police Department ("APD") Detective Christopher James Brown was assigned a case concerning reported road rage.  (Def. Ex. B, Brown Test. Tr. 251:17-24, Doc. 105-2.)  Allegedly, while stopped at an intersection, a man got out of his car, walked up to the car in front of his, screamed, and punched the car's windows. (Def. Ex. A at 1, Doc. 105-1.)  The man opened the driver's side door and grabbed the arm of the female driver. (*Id.*)  Without explanation, the man then "grunted" and walked away, returning to his vehicle. (*Id.*)  During a police photo array, the female driver identified her attacker as Christopher Torres. (*Id.*)  On summary judgment, Plaintiff does not deny that Mr. Torres was the man involved in the traffic incident.

Defendant Officer Brown conducted an investigation and discovered twenty-five "calls for service," meaning traffic complaints, related to Mr. Torres' car.  (*Id.*)  During his investigation, however, Defendant Brown did not discover that Mr. Torres had a history of schizophrenia.  (Pl. Ex. E, Brown Test., Tr. 259:1-22, Doc, 132-5.)  APD, as an agency, was aware that Mr. Torres had schizophrenia and had previously assigned Mr. Torres an officer who was trained to interact with mentally ill citizens.  (Pl. Ex. 10, Lopez Dep. 4:24-5:7, 15:5-17:2, Doc. 133-10.)  Due to their son's mental instability, Mr. Torres' parents asked to be contacted whenever APD needed to talk to Mr. Torres.  (Pl. Ex. 17, Renetta Torres Dep. 83:17-21, Doc. 129-17.)  Furthermore, based on prior APD charges, Mr. Torres had a pending mental health competency hearing in state court—which was a matter of public record and easily searchable on the internet according to another APD officer.  (Pl. Ex. 18, Doc. 29-18; Pl. Ex. 4, Lopez Dep. 64:2-14, Doc. 129-4.)  Although he claims he conducted a thorough background investigation, Defendant Brown did not learn any of this.  (Pl. Ex. E, Brown Test., Tr. 259:1-22; Pl. Ex. 15,

Brown Dep. 54:12016, Doc. 133-15.)  Based on the road rage incident, Defendant Brown drew up a warrant to arrest Mr. Torres for aggravated automobile burglary.  (Def. Ex. A.)

Two months after the incident, Defendant Brown, accompanied by Defendant Officer Richard Hilger, went to the house where he believed Mr. Torres resided.  (Def. Ex. B, Tr. 269:3-15; Def. Ex. D, Hilger Test., Tr. 155:5-10, Doc. 105-4.)  Defendant Brown did not intend to arrest Mr. Torres immediately.  (Def. Ex. B, Tr. 269:6-8.)  The officers went to the house with the intention of conducting a "knock-and-talk" with Mr. Torres.  (*Id.*)  Both officers were wearing plainclothes.  (*Id.* at 270:12-14.)  Their badges were not visible.  (Pl. Ex. 9, Brown Test. Tr. 274:15-15, Doc. 133-9.)  Neither officer carried a lapel or body camera.  (Pl. Ex. E, Tr. 270:4-11; Pl. Ex. A, Hilger Test., Tr. 95:17-21, Doc, 132-1.)  Defendant Brown explained that officers did not need to wear their cameras when they were dressed in plainclothes.  (Pl. Ex. E, Tr. 270:4-11.)

After no one responded to the knock on the door, the officers were about to leave when Defendant Hilger heard a noise from the yard.  (Def. Ex. D, Tr. 156:7-20; Def. Ex. B. Tr. 275:8-16.)  Defendant Hilger called out Christopher Torres' name and the man in the backyard responded, "Yes?"  (Def. Ex. D, Tr. 159:19-23; Def. Ex. B, Tr. 275:14-16.)  On the afternoon of Tuesday, April 12, 2011, Mr. Torres was in the yard at his parents' home wearing pajamas and socks.  (Def. Ex. D, Tr. 156:24-157:2.)  He was carrying a broomstick, which he put down when he began to speak with the officers.  (*Id.* at 157:2-10.)

The two officers were separated from Mr. Torres by a four- or five-foot fence.  (*Id.* at 158:24-159:2.)  Defendant Hilger recalls that he identified himself as a detective and asked to speak to Mr. Torres.  (*Id.* at 157:5-10.)  Mr. Torres was not forthcoming.  When Defendant Hilger said he wanted to talk, Mr. Torres replied that they were talking.  (Def. Ex. D, Tr. 158:3-

7.)  When Defendant Hilger clarified that he wanted to talk "face to face," Mr. Torres responded that they were talking face to face.  (*Id.* at 158:8-12.)  Defendant Hilger recalls that his "goal" was to get Mr. Torres out of the backyard, but he did not explicitly ask Mr. Torres to exit the yard.  (*Id.* at 158:15-20.)  The Defendant Officers considered Mr. Torres' literal responses to be disrespectful and disobedient.  (Def. Ex. B, Tr. 276:5-11.)  At that point, Defendant Brown said, "I have a warrant for your arrest."  (*Id.* at 278:17-22.)  Expressing his disbelief, Mr. Torres said, "No, you don't.  I haven't done anything wrong."  (*Id.*; Def. Ex. D, Tr. 159:22-160:5.)  "I'm afraid you have," responded Defendant Brown.  (Def. Ex. B, Tr. 279:1-2.)  When Defendant Brown informed Mr. Torres that he needed to go with the officers, Mr. Torres replied, "This is my backyard.  I will fight you."  (*Id.* at 279:5-11.)  As he said this, Mr. Torres took a step back, away from the detectives.  (*Id.* at 279:19-24.)

Defendant Brown decided to, and did, jump the fence to arrest Mr. Torres.  (*Id.* at 280:3-13.)  At times, Defendant Brown has said he jumped the fence because Mr. Torres would not "partake" in their conversation.  (Pl. Ex. E, Tr. 267:11-12.)  At other times, Defendant Brown has said he had no choice: he needed to jump the fence to "de-escalate" the situation, in case Mr. Torres—who was in stocking feet and pajamas—tried to run.  (*Id.* at 281:3-13.)  Defendant Brown approached Mr. Torres with his handcuffs.  (Def. Ex. B, Tr. 283:7-9.)  Noticing that the fence was loose, Defendant Hilger pulled away part of the fencing and climbed into the yard to join Defendant Brown.  (Def. Ex. D, Tr. 169:11-21.)

At this point, the parties' characterization of the incident sharply diverges.  The Defendant Officers have their side of the story, while a next door neighbor, who witnessed the ensuing altercation from her backyard, tells a very different tale.  Defendants and Plaintiff disagree over the reasonableness of the officers' responses and the cause of the deadly

altercation.  Because the officers did not wear their body cameras, there is no video recording and little objective evidence.  (Pl. Ex. E, Tr. 270:4-11.)

The officers recount that Mr. Torres swung at them and struck Defendant Hilger in the face.  (Def. Ex. B, Tr. 283:15-21; Def. Ex. D, Tr. 170:12-20.)  Plaintiff notes that Mr. Torres' hands did not have any marks consistent with punching anyone and that Defendant Hilger did not sustain any facial injuries.  (Def. Ex. D, Tr. 170:18-24; Pl. Ex. A, Tr. 118:9-17.)  Defendant Hilger lunged at Mr. Torres and took him to the ground.  (Def. Ex. D, Tr. 170:12-17.)  Ultimately, all three men ended up on the ground in a physical fight.  Mr. Torres was face down while Defendant Brown was on his back and Defendant Hilger was on his right side.  (Def. Ex. B, Tr. 287:14-288:2; Def. Ex. D, Tr. 176:12-177:8.)

During the altercation, Defendant Brown thought he saw Mr. Torres with a knife.  When Defendant Brown yelled, "He's got a knife," Mr. Torres responded, "I don't have anything." (Def. Ex. D, Tr. 177:21-25.)  Defendant Hilger grabbed Mr. Torres' hand but did not see a knife or any other weapon.  (Pl. Ex. A, Tr. 178:4-7.)  The glint of metal that Defendant Brown saw was not a knife, but the detective's handcuffs.  (Def. Ex. B, Tr. 304:8-16.)  Neither officer relies on the mistaken knife sighting for their use of deadly force.

The officers had Mr. Torres on the ground, lying on his stomach, with his hands underneath his body.  (Def. Ex. B, Tr. 284:6-11, 287:14-21.)  Defendant Brown straddled Mr. Torres in a "grapevine" hold and attempted to handcuff him.  (Def. Ex. B, Tr. 287:22-288:2.) Defendant Hilger, while on Mr. Torres' side, pinned Mr. Torres' right arm in the crook of his knees.  (Def. Ex. D, 181:19-182:4.)  Both officers apparently dropped their handcuffs during the struggle and thus did not cuff Mr. Torres.  (Def. Ex. D, Tr. 179:14-180:4; Pl. Ex. 4, Hilger Test. Tr. 222:21-223:4, Doc. 133-4.)  While Defendant Hilger attempted to make a radio call, he

claims that Mr. Torres reached around with his right hand and loosened the officer's gun from its holster.  (*Id.* at 182:5-8, 190:13-20.)  Allegedly, Mr. Torres was able to free his right arm from Defendant Hilger's knees and grab the gun.  (*Id.*)

Defendant Hilger scuffled with Mr. Torres to retrieve the gun.  (*Id.* at 199:24-200:10.) First, Defendant Hilger repeatedly commanded Mr. Torres to let go of the gun.  (*Id.* at 191:12-15.) Next, he warned Defendant Brown, "C.J., he's got my gun!"  (*Id.* at 192:1-3.)  Then, Defendant Hilger began punching Mr. Torres as hard as he could.  (*Id.* at 192:23-24.)  Mr. Torres, though still flat on his stomach, got both hands free and waived the gun from a "Superman" position.  (*Id.* at 196:17-197:1.)  Defendant Hilger tried to regain the gun by knocking it on the ground.  (*Id.* 199:24-100:10.)  Eventually, Defendant Hilger yelled, "He's got my gun! Shoot him! Shoot him!"  (*Id.* at 205:18-206:3.)

Independently, Defendant Brown saw that Mr. Torres had Defendant Hilger's gun.  (Def. Ex. B, Tr. 297:3-13.)  Amazingly, while Defendant Brown was on top of Mr. Torres, who was lying face down on the ground, Defendant Brown says Mr. Torres held the gun in his right hand and pointed the gun at Defendant Hilger, who was behind him on his right.  (*Id.* at 297:3-13, 292:16-18, 298:16-18.)   Differing on this point, Defendant Hilger does not recall the gun pointing at him.  (Def. Ex. D, Tr. 200:11-14, 206:11-18.)  In self-defense, Defendant Brown drew his own weapon and shot Mr. Torres in the back.  (Def. Ex. B, Tr. 297:15-19.)  Thinking his gun failed, Defendant Brown shot Mr. Torres in the back a second time.  (*Id.* at 297:24-298:12.)  Because Mr. Torres was still struggling, Defendant Brown shot Mr. Torres a third time in the back.  (*Id.* at 298:20-299:14.)  Mr. Torres ceased struggling and lay flat on the ground with his hands underneath his body.  (*Id.* 299:16-19.)  Defendant Brown remembers that after he fired the third shot, he looked up and saw Defendant Hilger holding his gun in a "low ready position."

(*Id.* at 303:23-304:4.)   The Defendant Officers do not explain at what point Defendant Hilger recovered his gun from Mr. Torres.

Plaintiff vigorously denies that Mr. Torres ever disarmed Defendant Hilger.  Based on the physical evidence, Plaintiff argues that the Defendant Officers' story is unlikely or impossible. (Pl. Ex. G, Doc. 132-7; Pl. Ex. H, Schiro Dep. 40:16-24, Doc. 132-8; Pl. Ex. J, Lavilla Dep. 25:1-23, Doc. 132-10.)  Plaintiff also proffers the testimony of the next door neighbor, Christie Apodaca, who started watching the incident after she heard yelling from the next door yard.  (Pl. Ex. I, Apodaca Dep. 75:18-76:16, Doc. 132-6.)  Watching through a knot hole in the fence, Ms. Apodaca saw the officers struggling with Mr. Torres.  (*Id.* at 96:19-24.)  She did not realize the men were police officers and assumed that her neighbor was being robbed.  (*Id.* at 95:3-6.) According to Ms. Apodaca, one man was on Mr. Torres' back while the other one was on his right side, punching him.  (*Id.* at 93:4-12.)  When Ms. Apodaca heard the officer on the side— presumably Defendant Hilger—say, "I'm going to shoot you," Ms. Apodaca turned around and "sprinted" back to the house to call 911.  (*Id.* at 96:11-13, 97:4-2.)  Before she could reach the door, she heard three gun shots.  (*Id.* at 98:5-14.)  She never saw Mr. Torres reach for the gun. She did not hear either officer yell, "He's got my gun."  (*Id.* at 96:14-18.)

Mr. Torres succumbed after being shot in the back three times.  (Def. Ex. B, 299:16-17.) After Mr. Torres' death, the officers handcuffed him.  (*Id.* at 304:5-7.)  Christopher Torres was pronounced dead on April 12, 2011, at 4:01 p.m.  (Pl. Ex. Q.)  He was one week shy of his twenty-eighth birthday.  (*Id.*)  Defendant Brown says that he may have approached the situation differently had he known that Mr. Torres had schizophrenia.  (Pl. Ex. 24, Brown Test. Tr. 266:6-20, Doc. 129-24.)

In the years 2006 to 2010, APD had a higher than average number of police shootings and a higher than average number of citizen deaths.  (Pl. Ex. 3, Schultz Dep. 105:7-11, 115:2-11, Doc. 133-3.)  Specifically, APD officers shot 43 men, resulting in 18 injuries and 21 deaths.  (Pl. Ex. 5, Doc. 133-5.)  54% of the citizens involved in the shootings had a confirmed history of mental illness.  (Pl. Ex. 13 at 13, Doc. 133-13.)  During this time period, no officers were prosecuted or disciplined.  (Pl. Ex. 3, Schultz Dep. 93:21-25; Pl. Ex. 5.)  To the contrary, APD would issue press releases condoning the officers' actions.  (Doc. 133 ¶ 11.)

A large number of the officers involved in the shootings were hired in 2007, shortly after the Albuquerque mayor made a push to hire more police officers.  (Pl. Ex. 3, Schultz Dep. 19:12-21; Pl. Ex. 13 at 15.)  Defendant Brown was one of the 2007 hires.  (Def. Ex. 2, Brown Dep. 6:12-13, Doc. 109-2.)  He was hired as a lateral transfer from the Roswell Police Department even though he had previously been rejected by APD.  (*Id.* at 10:24-11:4; Pl. Ex. 17, Doc. 133-17.)

On June 28, 2011, acting as the personal representative of his son's estate, Plaintiff filed an action in New Mexico state court.  (*Torres I* Compl., Doc. 212-1.)  Over a year later, Plaintiff filed a parallel action with this Court on October 9, 2012.  (Compl., Doc. 1.)  The Court stayed the federal action on June 26, 2014, and ordered the parties to file motions for claim or issue preclusion within 14 days of the state court's final judgment.  (Doc. 207.)  After denying Defendants' motion for claim and issue preclusion and granting Plaintiff's motion for issue preclusion, the Court lifted the stay.  (Doc. 220; Doc. 221.)  Presently, the Court considers six motions for partial summary judgment which were briefed before the stay.

## II.      LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id.* At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006). If there is a genuine dispute of material fact, then the "facts must be viewed in the light most favorable to the nonmoving party . . . ." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## III.     DISCUSSION

Plaintiff charges Defendants with three counts of wrongful conduct: (1) constitutionally excessive force against the Defendant Officers; (2) Section 1983 municipal liability claims against the City; and (3) an Americans with Disabilities Act violation against APD and the City. Defendants oppose all counts and claims. In their briefing, Defendants ask the Court to deem several of their facts admitted because Plaintiff presented his facts in an unconventional manner. (Docs. 171, 173.) The Court finds this to be an overly harsh reaction and declines the invitation. Instead, the Court will consider the facts put before it.

### A. Excessive Force

To challenge Plaintiff's excessive force claim, Defendants premise their Motion for Summary Judgment on the doctrine of qualified immunity. (Doc. 105.) "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  To determine whether qualified immunity applies, courts consider two questions.  *See id.* at 236 (explicating the two-prong inquiry for qualified immunity).  First, did the defendants' actions violate the decedent's constitutional rights?  *See id.*  Second, was the complained-of constitutional violation "clearly established" such that a reasonable officer would have known that his conduct was unlawful?  *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The plaintiff has the burden to show that the defendants are not protected by qualified immunity.  *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007).  Notwithstanding this burden, when considering qualified immunity on summary judgment, courts must take care to view the facts in the light most favorable to the plaintiff.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).  The defendant retains the burden to show that there are no disputed material facts. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) ("If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.") (quotations omitted).

Plaintiff alleges that the Defendant Officers used excessive force when they beat and then killed Mr. Torres.  Claims that law-enforcement officers used excessive force are governed by the Fourth Amendment's "reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014).  To assess reasonableness, courts "ask whether the totality of the circumstances justified the use of force."  *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (quotations omitted).  Police officers' decisions to use deadly force are justified only "if a reasonable officer in Defendants' position would have

had probable cause to believe that there was a *threat of serious physical harm to themselves* or to

others." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)

(quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004)).   In situations like the

one here, "[t]he reasonableness of Defendants' actions depends both on whether the officers

were in danger at the precise moment that they used force and on whether Defendants' own

reckless or deliberate conduct during the seizure unreasonably created the need to use such

force." *Sevier*, 60 F.3d at 699; *see also Cordova v. Aragon*, 569 F.3d 1183, 1202 (10th Cir.

2009) (quoting same).

Because "'police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

necessary in a particular situation,' the reasonableness of the officer's belief as to the appropriate

level of force should be judged from that on-scene perspective." *Saucier*, 533 U.S. at 205 (2001)

(quoting *Graham*, 490 U.S. at 397).   Use of the "20/20 vision of hindsight" is not permitted.   *Id.*

(internal quotations omitted).   The Court takes seriously an officer's sworn statement that he felt

fear for his life.   *See Romero v. Bd. of Cnty. Comm'rs*, 60 F.3d 702, 703-04 (10th Cir. 1995)

("An officer's use of deadly force in self-defense is not constitutionally unreasonable.").   In such

situations, the Court does not lightly deny qualified immunity.

Defendants argue that Plaintiff cannot meet his burden.   They argue that Defendant

Brown needed to jump the fence to "de-escalate what still was a non-violent situation" because

Mr. Torres was a wanted felon, was uncooperative, and a flight risk.   (Doc. 105 at 22.)

According to Defendants, Mr. Torres swung at the officers before the officers ever punched him.

(Def. Ex. B, Tr. 283:15-21; Def. Ex. D, Tr. 170:12-20.)   Defendant Hilger claims that he did not

start punching Mr. Torres in earnest until Mr. Torres wielded the gun.   (Def. Ex. D, Tr. 192:23-

24.)  The Defendant Officers further argue that deadly force was justified because Mr. Torres threatened them with a loaded gun.  (Doc. 105 at 17-23.)  If Defendants' version of the facts is correct—if Mr. Torres began the altercation and then threatened the officers with Defendant Hilger's gun—then the officers would have been justified in using deadly force.  *See Wilson v. Meeks*, 52 F.3d 1547, 1554 (10th Cir. 1995), *abrogated on other grounds by Saucier*, 533 U.S. at 205 (holding that officer acted reasonably in shooting suspect who was pointing gun in officer's direction); *Medina*, 252 F.3d at 1132 (holding that officers were justified in shooting suspect when they mistakenly but reasonably believed that the suspect had a gun).

Plaintiff argues that using any force against Mr. Torres was unreasonable, and alternatively, if any force was necessary, the need was created by Defendants' reckless and unreasonable conduct.  (Doc. 132.)  He posits that Mr. Torres, who was alone in his backyard wearing pajamas and socks, was not a threat or a flight risk.  (Doc. 132 at 22.)  By "charg[ing] into Mr. Torres' yard and physically assault[ing] him," Plaintiff argues that the officers acted unreasonably.  (Doc. 132 at 23.)  Plaintiff attributes any non-cooperation from Mr. Torres to his fear and lack of understanding.  (Doc. 132 at 22.)

Although he does not challenge the facts leading up the confrontation, Plaintiff questions the propriety and necessity of the Defendant Officers' actions.  Defendant Brown drew up a warrant for felony aggravated burglary, but Mr. Torres' crime was arguably misdemeanor road rage.  (Def. Ex. A.)  The facts of the traffic incident suggest that Mr. Torres' conduct was not serious enough, on its own, to justify physical violence.  If the Defendant Officers were truly concerned that Mr. Torres was a threat to the community, they would not have waited two months to draw up and execute the warrant.  Mr. Torres was also not a serious flight risk.  The Defendant Officers never suggest that Mr. Torres attempted nor threatened to run.  Finally, at the

time that the officers breached the fence, Mr. Torres was not a threat to their safety.  He was unarmed and had not approached the officers in a threatening manner.  Although the officers considered Mr. Torres responses disrespectful, they were literal interpretations of Defendant Hilger's words: Mr. Torres was speaking with the officers "face to face."  Strictly speaking, Mr. Torres was not disobedient.  While Mr. Torres did say, taking a step backwards, that he would fight the officers if they tried to take him, the officers did not say they felt threatened, nor were they cowed.  Rather, Defendant Brown decided at that moment to arrest Mr. Torres even if it led to physical resistance.  The Court fails to see how Defendant Brown's decision to jump over the fence "de-escalated" the situation.

Moreover, Plaintiff presented evidence to dispute Defendants' contention that punching and wrestling Mr. Torres was reasonable under the circumstances or the law.  Although Defendants claim that Mr. Torres threw the first punches and struck Defendant Hilger, Plaintiff notes that Mr. Torres' hands did not have any marks consistent with punching anyone and that Defendant Hilger did not sustain any facial injuries.  (Def. Ex. D, Tr. 170:18-24; Pl. Ex. A, Tr. 118:9-17.)  Furthermore, eyewitness Christie Apodaca says she saw the two officers wrestling and repeatedly punching Mr. Torres even though he was face down on the ground and did not have a weapon.  (Pl. Ex. I, Apodaca Dep. 93:4-12.)  Plaintiff's facts suggest that the officers were the aggressors, not Mr. Torres.  If Plaintiff's version of the facts is correct, then the officers acted unreasonably when they physically attacked and beat Mr. Torres.  Whether the officers were justified using deadly force is a separate question.

First and foremost, Plaintiff argues that Defendants' use of deadly force was unreasonable because Mr. Torres was unarmed and did not threaten the officers with a gun.  (Doc. 132 at 20-21.)  Proffering several pieces of evidence, Plaintiff challenges the Defendant

Officers' version of the facts.  Plaintiff argues that the Defendant Officers' recitation of the facts is physically unlikely.  The officers claim that Defendant Brown had Mr. Torres in a "grapevine" hold and Defendant Hilger had Torres' right arm pinned down when Mr. Torres unholstered Defendant Hilger's gun.  (Def. Ex. B, Tr. 287:22-288:2; Def. Ex. D, 181:19-182:4.)  Mr. Torres would have had difficulty unholstering the gun from his immobilized state, especially considering that "it takes some force to pull" Defendant Hilger's gun out of his holster (Def. Ex. D, Tr. 190:13-20).  Furthermore, when Plaintiff collapsed after being shot three times, his arms were underneath his body (Def. Ex. B, Tr. 284:6-11, 287:14-21), suggesting that his arms may not have been waving around.  Plaintiff also provides Ronald Scott's expert report analyzing the physical evidence.  (Pl. Ex. G, Doc. 132-7.)  In Mr. Scott's assessment, it is unlikely that Mr. Torres and Defendant Hilger fought over the gun because the gun did not have any damage consistent with a fight for possession.  (*Id.* at 13, 15.)

Additionally, eyewitness Christie Apodaca did not see Mr. Torres with the gun, but did hear an officer threaten to shoot Mr. Torres.  (Pl. Ex. I, Apodaca Dep. 96:11-13, 122:21-123:4.)  Although Ms. Apodaca did not see the actual shooting, only a short time passed between the time she saw the struggle and the sound of three gun shots.  (*Id.* at 96:11-13, 97:4-2.)  In the intervening period, she did not hear either officer shout, "He's got my gun!" despite Defendant Hilger's claims that he repeatedly yelled at Mr. Torres and to Defendant Brown. (*Id.* at 96:14-18.)  Viewing the facts in a light most favorable to Plaintiff, the Defendant Officers violated Mr. Torres' constitutional rights when they used deadly force against him.

Second, and alternatively, Plaintiff argues that the officers are liable, based on their reckless conduct, for shooting Mr. Torres even if he did threaten them with a gun. (Doc. 132 at 22-23.)  Officers may be liable for otherwise lawful defensive force when they unnecessarily and

14

recklessly provoke a violent confrontation.  *See Sevier*, 60 F.3d at 699.  Prior to the officers'

efforts to breach the fence, Mr. Torres was alone in his backyard wearing pajamas.  He was

neither a threat nor a flight risk.  As previously discussed, Plaintiff presented evidence that the

officers were the aggressors in the physical altercation with Mr. Torres.  These events directly

led to the moment when Mr. Torres allegedly grabbed for Defendant Hilger's gun.  Officers'

actions that are "immediately connected" to a suspect's threat of force "should be included in the

reasonableness inquiry."  *Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir. 1997).  In *Allen*, the

Circuit reversed and remanded a grant of summary judgment because, although the suspect

indisputably pointed a gun at the officers, the Circuit found genuine disputes of material fact

regarding whether the officers' reckless conduct created the crisis and the officers' subsequent

need to shoot the suspect.  *Id.*  Similarly, the parties in this case, and their dueling eye witnesses,

dispute the nature of the threat leading up to the shooting.  A reasonable jury could conclude that

the officers' actions were "reckless and precipitated the need to use deadly force."  *Id.*  Thus,

Plaintiff has two alternate theories for his Fourth Amendment excessive force claim.

Examining the facts in the light most favorable to him, Plaintiff has carried his burden to

show that Defendants arguably violated Mr. Torres' constitutional rights under clearly

established law.  The parties agree deadly force is constitutionally unreasonable against an

unarmed, non-dangerous individual.  *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("A police

officer may not seize an unarmed, nondangerous suspect by shooting him dead.").  The parties

further agree that *Sevier-Allen* provides the relevant legal standard and is clearly established law.

(Docs. 105 at 17; 132 at 18-19.)  If Plaintiff's version of the facts is true, the officers

unnecessarily began a physical fight and then either shot a non-dangerous Mr. Torres or

recklessly provoked Mr. Torres into reaching for the gun.  Either scenario violates clearly established law.

Plaintiff provided sufficient evidence to raise a genuine dispute over the facts relevant to the Defendant Officers' claim for immunity.  In another brief, "Defendants acknowledge that there are remaining issues of fact with regard to reasonableness of the force employed by Detective Brown and Hilger."  (Doc. 175 at 26.)  Because the factual disputes go to the heart of the Defendant Officers' claim for qualified immunity, summary judgment is inappropriate.  *See Coen v. Runner*, 854 F.2d 374, 377 (10th Cir. 1988) ("A defendant who makes such a showing of objective reasonableness is entitled to summary judgment unless the plaintiff can demonstrate that there are factual disputes relevant to the defendant's claim to immunity.").  For that reason, the Court denies Defendants' motion for summary judgment on Count III.

### B.  Municipal Liability

Plaintiff argues that the APD's culture of excessive force resulted in a pattern of civil rights abuses.  (Doc. 133.)  If a governmental entity has a policy or custom that has "inflict[ed] the injury" on a plaintiff, then "the government as an entity is responsible under § 1983."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Plaintiff has four theories of municipal liability: (1) the City had a pervasive culture of indifference to excessive force; (2) the City inadequately supervised officers; (3) the City inadequately trained officers; and (4) the City's decision to lower its hiring standards led to the inadequate screening of Defendant Brown during the hiring process.  Defendants challenge each theory.

#### 1.  *Culture of Excessive Force*

To prove an unlawful policy or custom claim, a plaintiff must show "(1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the

16

moving force behind the constitutional deprivation." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 667 (10th Cir. 2010).  Additionally, "[i]f the plaintiff asserts the alleged custom or policy comprised a failure to act, he or she must demonstrate the municipality's inaction resulted from 'deliberate indifference to the rights' of the plaintiff." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).  As discussed above, Plaintiff created a genuine factual dispute over the Defendant Officers' violation of Mr. Torres' Fourth Amendment rights.  Now, Plaintiff must prove that the City is responsible for the violation because (1) a municipal policy or custom was the moving force behind the deprivation and (2) the City acted with deliberate indifference.

Plaintiff does not assert that the City had any official rule or regulation that was unconstitutional.  Instead, Plaintiff asserts that despite its written policies, the City and APD had a custom of condoning force which in turn created a culture where officers could violate the Constitution with impunity.  (Doc. 133 at 28.)  According to Plaintiff, despite the high numbers of police shootings, APD leadership shielded shooters rather than disciplining them.  (Doc. 133 ¶¶ 8-27.)  "APD's standard response to each shooting was to, immediately after the shooting, and before any investigation was complete, issue a press release supporting the officer's actions and blaming the deceased."  (Doc. 133 ¶ 11.)  Instead of conducting independent reviews of the officers' shootings, APD conducted confidential internal investigations.  (Doc. 133 ¶ 13.)  At the time of Mr. Torres' shooting, no APD officer had ever been prosecuted for shooting a citizen.  (Doc. 133 ¶ 15.)  None of the officers received any disciplinary actions.  (Pl. Ex. 5, Doc, 133-5.)  This, Plaintiff argues, "created a culture permissive of violence at APD, where officers knew they would not be disciplined or fired for using unjustified force." (Doc. 133 at 6.)

A municipality may be held liable for a well-established custom or practice, even though it has "not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 691.  To hold a municipality liable for an unofficial custom, the alleged practice must be "so permanent and well settled as to constitute a custom or usage with the force of law."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)); *see also Bryson v. City of Oklahoma City*, 627 F.3d 784, 791 (10th Cir. 2010).  In the six years before Mr. Torres death, APD officers were involved in 43 shootings, injuring 18 men and killing 21.  (Pl. Ex. 5.)  Officers shot and killed 8 people in 2010 alone, the year directly preceding Mr. Torres' death.  (*Id.*)  Considering that none of the officers were prosecuted or disciplined, and were often applauded for their efforts, Plaintiff's statistics show that APD saw a string of shootings that were either condoned or, at least, not punished. (Pl. Ex. 5; Pl. Ex. 3, Schultz Dep. 93:21-25, Doc. 133-3; Pl. Ex. 6 ¶ 11, Doc. 133-6; Pl. Ex. 13 at 15, Doc. 133-13; Doc. 133 ¶ 11.)  This supports an argument that the practice of condoning violence was well-established.

Plaintiff must also show that the custom was "the moving force" behind Mr. Torres' injury.  *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  Plaintiff's theory is that APD's failure to discipline and to instead blindly support officers' actions "created a culture permissive of violence at APD, where officers knew they would not be disciplined or fired for using unjustified force."  (Doc. 133 at 6.)  For example, Defendant Hilger knew that officers had not been prosecuted for shooting citizens.  (Pl. Ex. 4, Hilger Test., Tr. 56:19-22, Doc. 133-6.) He also had never heard of any officers being disciplined for shootings.  (*Id.* at 56:23-57:11.) Plaintiff presents his expert, Dr. George Kirkham, for the opinion that APD's culture of "unquestionably condoning excessive force . . . communicated to all officers, including C.J.

Brown and Richard Hilger, that there would be no consequences for unjustified use of deadly force and virtually no investigation would occur to challenge officer accounts of the circumstances." (Pl. Ex. 6 ¶ 8, Doc. 133-6.)  In total, this evidence would allow a reasonable factfinder to conclude that APD's custom and culture was the moving force behind the Defendant Officers' actions and Mr. Torres' injury.

Finally, Plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  *Schneider*, 717 F.3d at 770 (quoting *Brown*, 520 U.S. at 407).  When a plaintiff alleges, as is the case here, that a municipality's failure to act caused the deprivation, the plaintiff must make an enhanced showing of causation; demonstrating that the municipality was "deliberately indifferent" to the potential constitutional violation.  *See Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 759 (10th Cir. 2014) ("Where a plaintiff seeks to create § 1983 municipal liability for failing to prevent the bad acts of a subordinate, the plaintiff must show that the municipality evidenced 'deliberate indifference' to the impermissible conduct.").  Plaintiff likens his argument to cases where municipalities, "by failing to do anything must have encouraged or at least condoned" constitutional violations. (Doc. 133 at 27.)  Accordingly, Plaintiff must show that Albuquerque was deliberately indifferent to Mr. Torres' rights.

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Schneider*, 717 F.3d at 771 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)). "[N]otice can be established by proving the existence of a pattern of tortious conduct."  *Id.*  In this case, Plaintiff provides evidence that APD knew, at least by 2010, that the department had "a

19

higher than normal number of deadly force encounters between officers and citizens." (Pl. Ex. 3, Schultz Dep. 115:2-11.)  In 2010, when compared to similarly-sized cities, Albuquerque had a higher than average shooting rate and a higher than average number of citizen deaths.  (*Id.* at 105:7-11.)  APD decisionmakers were aware of this at the time of Mr. Torres' death.  (*Id.*)

Defendants contest all of Plaintiff's assertions.  First, Defendants complain that many of Plaintiff's facts, particularly the facts regarding APD's historical responses to deadly force incidents, are contained in their expert's affidavit.  (Doc. 177 at 5; Doc. 175 at 2.)  Defendants argue that this is inadmissible evidence.  In responding to a summary judgment motion, however, a plaintiff only needs to produce facts that could be adduced at trial.  *See Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1250 (10th Cir. 2013) (explaining that evidence is "entirely proper on summary judgment" so long as the "content or substance of the evidence contained therein" will be admissible).  Even if the evidence is presented in a format that would be objectionable at trial, the facts are not necessarily improper for the purposes of summary judgment.  *Id.*  Plaintiff's expert submitted a sworn affidavit which relied on secondary sources and hearsay.  Experts may rely on such data.  Fed. R. Evid. 703.  Defendants can challenge the expert's methods in a *Daubert* challenge, but for purposes of summary judgment, the evidence is properly before the Court.

Second, Defendants contend that Plaintiff's data does not establish either a widespread problem or notice of a likely problem.  (Doc. 177 at 6.)  Defendants argue that some of the shootings may have been justified.  (*Id.*)  The Court agrees that this may be true.  However, Defendants' efforts to argue over the facts support the finding that there is a genuine dispute of material fact.  At this stage, that is sufficient for Plaintiff to meet his burden.

20

Plaintiff provided sufficient evidence to create a genuine, material dispute about whether Albuquerque had a custom and culture that was indifferent to excessive force violations. Defendants' motion for summary judgment on this claim is denied.

### 2. Inadequate Supervision

Government municipalities can be held liable for deliberately indifferent supervision. *See Schneider*, 717 F.3d at 769.  Defendants argue that Plaintiff's claim must fail because he did not identify or name any supervisors whose failures led to Mr. Torres' injuries.  (Docs. 108, 179.)  Plaintiff, however, is not bringing an individual-capacity suit, but a municipal liability suit based on APD's widespread customs.  *See id.* (explaining difference between individual supervisor liability and municipal liability).  Therefore, the cases that Defendants cite are inapposite.

Yet Defendants' argument points to another problem with Plaintiff's claim: the inadequate supervision claim collapses into his culture of excessive force claim.  The facts and arguments Plaintiff offers for both claims are identical.  The Court will deny Defendants' motion for summary judgment on the ground that Plaintiff's proffered evidence raises a genuine dispute of material fact.  However, the Court will strike the inadequate supervision claim because it is redundant.  *See* Fed. R. Civ. P. 12 ("The court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."); *see also Asten v. City of Boulder*, 652 F. Supp. 2d 1188, 1197 (D. Colo. 2009) (striking a claim because it was duplicative of another claim); *Nguyen v. CTS Electronics Mfg. Solutions Inc.*, 301 F.R.D. 337, 342 (N.D. Cal. 2014) ("[C]ourts utilize Rule 12(f) to strike parts of complaints which are redundant to other causes of action.").  The inadequate supervision claim needlessly repeats the averments of the unlawful custom allegation.  Courts may strike redundant material on their own motion.  *Garrett v. Selby Connor*

*Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005). This ruling is not intended to limit, or in

any way prejudice, Plaintiff's presentation of evidence at trial. *See Burrell v. Armijo*, 603 F.3d

825, 836 (10th Cir. 2010) (finding that motions to strike under 12(f) are harmless when they do

not prejudice a party's presentation of evidence at trial). Rather, the ruling simply consolidates

duplicative claims by striking the redundant legal theory.

### 3. Inadequate Training

Under "limited circumstances . . . an allegation of a 'failure to train' can be the basis for

liability under § 1983." *Canton*, 489 U.S. at 387. To establish liability for inadequate training, a

plaintiff must show:

> (1) the officers exceeded constitutional limitations on the use of force;
>
> (2) the use of force arose under circumstances that constitute a usual and recurring
>
> situation with which police officers must deal;
>
> (3) there is a direct causal link between the constitutional deprivation and the
>
> inadequate training; and
>
> (4) the inadequate training demonstrates a deliberate indifference on the part of
>
> the city toward persons with whom the police officers come into contact.

*Allen*, 119 F.3d at 841-42. While Defendants concede that the use of force arose in a recurring

situation and that there are genuine issues of fact regarding the constitutional limitations of the

officers' use of force, they vigorously deny that Plaintiff can prove causation or deliberate

indifference. (Doc. 175 at 26-27.)

"Where a plaintiff claims that the municipality has not directly inflicted an injury, but

nonetheless has caused an employee to do so, rigorous standards of culpability and causation

must be applied to ensure that the municipality is not held liable solely for the actions of its

employee." *Brown*, 520 U.S. at 405.  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).  "Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability."  *Brown*, 520 U.S. at 415; *see also Schneider*, 717 F.3d at 772-73 (quoting same).

To prove his claim, Plaintiff must identify a particular deficiency in APD's training program that caused Mr. Torres' death.  *Canton*, 489 U.S. at 390-91; *Connick*, 131 S. Ct. at 1363 (holding that the plaintiff needed to assert that the defendants were not trained about a "particular" violation "or the specific scenario related to the violation in his case").  "'Proving that an injury or accident could have been avoided if an employee had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct' will not suffice." *Connick*, 131 S. Ct. at 1363-64 (quoting *Canton*, 489 U.S. at 391).  Plaintiff challenges APD's training in two areas: (a) APD's trainings regarding deadly force, and (b) APD's responses to people with mental illness.

### a.  APD Inadequate Use-of-Force Training

Plaintiff has five theories supporting his claim that APD did not adequately train their officers in use-of-force: (1) officers were not properly trained to know when force is justified and when to use non-lethal force; (2) officers were not trained to de-escalate situations; (3) detectives were not trained that the use-of-force policies applied to them; (4) detectives were not required to carry non-lethal weapons; and (5) APD did not use prior force incidents to retrain officers.  (Doc. 133 at 31-38.)

To support the claim that officers were not trained in use-of-force or de-escalation, Plaintiff cites to the Police Executive Research Forum ("PERF") Report which APD

commissioned in late 2010. The PERF Report recommended that APD update its use-of-force training guide to include non-lethal force options. (Pl. Ex. 13 at 79, Doc. 133-3.) The PERF Report also recommended that, during training, officers practice with a variety of use-of-force options so that they are not solely faced with "we are here to fire our weapons"-type scenarios. (*Id.* at 80.) However, the same Report states that, based on a review of APD's training curricula and materials, APD use-of-force trainers were using "the best professional practices employed by other law enforcement agencies . . . known to be progressive in their training in this area." (Def. Ex. C at 67, Doc. 106-3.) Plaintiff's expert confirmed this finding. (Def. Ex. B, Kirkham Dep. 33:9-13, Doc. 106-2.)

Plaintiff himself admits that APD policies "require officers to assess the situation to determine which technique or weapon will reasonably deescalate an incident and bring it safely under control." (Doc. 133 at 7 ¶ 36.) Plaintiff's citation to the Police Chief's deposition confirms that prior to 2010, officers were trained in these use-of-force and de-escalation techniques. (Pl. Ex 3, Schultz Dep. 85:9-25.) In fact, Plaintiff elicited testimony from the Defendant Officers about their training in lethal and non-lethal force. (Pl. Ex. 3, Schultz Dep. 85:2-8 (describing Brown testimony); Pl. Ex. 4, Hilger Test. Tr. 34:2-36:5; Def. Ex. 5, Tr. 46:15-19, 49:1-24, Doc. 175-5.) Despite the evidence that APD officers were trained in non-lethal force and de-escalation, Plaintiff's expert explained that, while the materials were good, the training was inadequate because requirements must "have . . . teeth" and be consistently enforced. (*Id.* at 6:21-7:8.) While this may be true, this does not support a failure to train claim. It merely repeats Plaintiff's culture of excessive force claim. The Court rejects Plaintiff's first two theories on the basis that Plaintiff presented insufficient facts to show that the training was deficient as described.

24

To support the third theory of inadequate use of force training, Plaintiff claims that Officers Hilger and Brown were trained that the use-of-force policies applied to uniformed officers, but not to detectives in plainclothes.  (Doc. 133 at 9.)  Again, Plaintiff does not provide evidence to support this claim.  The testimony Plaintiff cites in support shows only that officers who were not in uniform were not required to carry intermediate weapons or recording devices. In contrast, the evidence shows that the officers were trained in the limits of lethal force.  (Pl. Ex 3, 85:2-8; Def. Ex. 5, Tr. 46:15-19, 49:1-24.)  Additionally, the Defendant Officers were trained in alternate non-lethal techniques that did not require intermediate weapons.  (Def. Ex. 5, Hilger Test. Tr. 46:15-19, 49:1-24, Doc. 175-5.)  Thus, the evidence shows that the officers were trained about use-of-force options that applied to all officers.

For the fourth theory of inadequate training, Dr. Kirkham testified in his deposition that non-uniformed officers were not required to carry "intermediate weapons"—such as pepper spray, a Taser, or a baton—when Mr. Torres was killed.  (Pl. Ex. 2, Kirkham Dep. 18:6-11, Doc. 133-2; Pl. Ex. 8, Kirkham Dep. 43:19-24, Doc. 133-8.)  Dr. Kirkham cites this as a significant problem.  (*Id.*)  Defendant Hilger's deposition testimony confirms that non-uniformed officers were not expected to carry intermediate weapons.  (Pl. Ex. 4, Hilger Test., Tr. 36:2-5, 40:9-13.) Plaintiff identified this alleged deficiency with sufficient facts.

Finally, Plaintiff complains that APD missed an opportunity to retrain officers based on prior incidents where deadly force was employed.  (Doc. 133 at 35.)  One of APD's police trainers agreed that discussing real-life incidents was beneficial and recalled that, with regard to one particular incident, the trainer discussed the incident generally, but not with specific detail. (Ex. 1, Tate Dep. 75:14-76:24, Doc. 133-1.)  Again, Plaintiff identified this alleged deficiency with sufficient facts.

25

For each identified deficiency, Plaintiff must establish that the challenged policy was "closely related to the violation of the plaintiff's federally protected right." *Schneider*, 717 F.3d at 770. Plaintiff can meet this burden by showing that "the municipality was the 'moving force' behind the injury alleged." *Id.* (quoting *Brown*, 520 U.S. at 404). "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Id.*

Plaintiff did not meet his burden to show that APD's policy of not requiring plainclothes officers to carry intermediate weapons was "the moving force" behind Mr. Torres' injury. The standard for causation in failure to train cases is high. In *Schneider*, the Tenth Circuit rejected the plaintiff's failure to train claim on the basis that she had "failed to show, as the law requires, that 'the need for more or different training was so obvious' that a violation of her constitutional right . . . was likely to result from not providing it." *Schneider*, 717 F.3d at 773-74. Noting that the offending officer had been trained, but acted in violation of his directives, the Circuit concluded that "it is unclear how the training advocated by [the plaintiff] would have prevented the assault on her." *Id.* at 774. Here, Plaintiff did not provide any evidence that suggested that if the Defendant Officers had additional weapons to use, the outcome would have changed. In fact, most of Plaintiff's evidence supports the opposite conclusion. Plaintiff's primary theory is that while APD had good use-of-force policies on paper, its failure to enforce the policies led to a culture of violence where officers were permitted to use excessive force. For instance, Plaintiff specifically elicited testimony from Defendant Hilger that he was trained in alternate force options which would have been non-lethal (Def. Ex. 5, Tr. 46:15-19, 49:1-24), but still the officers resorted to deadly force. Under the *Schneider* precedent, Plaintiff failed to show APD's

policy of not requiring plainclothes officers to carry intermediate weapons was the "moving force" behind Mr. Torres' injury.

Similarly, the Court is not convinced that APD's failure to use past incidents to retrain officers caused Mr. Torres' deprivation.  Retraining sounds like a useful tool.  Defendants themselves "agree that past incidents involving the use of force and encounters with the mentally ill population can be valuable training tools."  (Doc. 175 at 9 ¶ 43.)  "But failure-to-train liability is concerned with the substance of the training, not the particular instructional format."  *Connick*, 131 S. Ct. at 1363.  Plaintiff's evidence shows that APD trained officers on the constitutional limits of the use of force.  The Court does not have the authority to require a police department to employ a particular teaching method.  Nor does Section 1983 give Plaintiff, or the courts, "*carte blanche* to micromanage local governments throughout the United States."  *Id.*  Although Plaintiff's suggestion is worthwhile, it does not create a foundation for a constitutionally inadequate training claim.

Plaintiff did not raise any disputed issues of fact on his inadequate use-of-force training theory.  Although he points to some failures or weaknesses in APD's training, these are not sufficient to hold the City liable for Mr. Torres' death.  Courts must not engage "in an endless exercise of second-guessing municipal employee-training programs."  *Canton*, 489 U.S. at 392.

### b.  *APD's Responses to People with Mental Illness*

Plaintiff's final failure-to-train theory is that there was a systematic gap in APD's responses to citizens with mental health challenges.  According to the PERF study, between the years 2006 and 2010, 54% of the suspects that APD officers shot had a confirmed history of mental illness.  (Pl. Ex. 13 at 13, Doc. 133-13.)  As part of the basic curriculum at the police academy, APD trains all officers how to communicate with people in mental health crises.  (Pl.

Ex. 3, Schultz Dep. 148:15-20; Pl. Ex. 1, Tate Dep. 75:1-13.)  In an effort to better respond to the high numbers of citizens in mental health crises, APD provides additional training to officers who become part of the Crisis Intervention Team field office.  (Doc. 106 ¶ 5; Pl. Ex. 3, Schultz Dep. 148:5-15.)  25% of field officers are specially trained in crisis intervention.  (*Id.* at 148:19-20.)  Plaintiff acknowledges APD's efforts to train sections of its police force to respond to people in mental health crises.  Plaintiff's own expert applauds the effort.  (Def. Ex. B, Tr. 33:22-34:3.)

APD previously devoted its crisis intervention resources to Mr. Torres' case.  After an incident at a restaurant that suggested Mr. Torres suffered from delusional thinking, Mr. Torres was assigned to Detective Xavier Lopez, one of the crisis intervention officers.  (Pl. Ex. 10, Lopez Dep. 4:24-5:7, 55:4-57:23.)  Detective Lopez spoke to Plaintiff and to Mr. Torres.  (*Id.* at 66:9-24.)  During his conversations, he learned that Mr. Torres suffered from schizophrenia, but was receiving treatment and medications.  (*Id.* at 66:16-67:5.)  Detective Lopez testified that information on Mr. Torres' past arrests, mental illness, and pending mental competency hearing were easily searchable online.  (*Id.* at 23:7-24, 64:2-14.)

However, when Defendants Brown and Hilger went to Mr. Torres' house on April 12, they did not know any of this information.  (Pl. Ex. E, Brown Test., Tr. 259:1-22, Doc, 132-5.)  Defendant Brown testified that he was trained to do "as thorough a background as possible" before effecting an arrest. (Pl. Ex. 15, Brown Dep. 54:12-16, Doc. 133-15.)  Yet Defendant Brown's background investigation did not reveal any information about Mr. Torres' illness, even though APD was aware of his condition.  Defendant Brown did not conduct a broad internet search but, rather, relied on APD databases.  (*Id.* at 56:22-57:25.)  Plaintiff highlights a glaring gap in APD's response.  Either the crisis intervention specialists should have been trained to

28

report their information to conventional officers or conventional officers should have been trained to otherwise uncover such information during their background investigations.   In this case, the officers' failure to communicate created a fatal vacuum of information.

Plaintiff provides sufficient facts to establish causation for this theory.   APD officers agree that officers will make better decisions when they have comprehensive background information.   (Pl. Ex. 3, Schultz Dep. 140:12-13.)   Knowing in advance that an arrestee has mental health issues is safer for the arrestee, the officers, and bystanders.   (Ex. 1, Tate Dep. 58:18-59:6, 83:16-84:3; Pl. Ex. 3, Schultz Dep. 138:16-139:3.)   Yet the Defendant Officers allegedly had no ready way to discover that Mr. Torres had a history of schizophrenia and had been assigned an APD liaison.   Instead, the Defendant Officers confronted Mr. Torres and labeled his literal responses "disobedience," rather than a sign of mental illness.   Defendant Brown testified that he may have handled the situation differently had he known that Mr. Torres suffered from schizophrenia.   (Pl. Ex, 9, Brown Test. Tr. 266:6-13, 268:9-20.)   In short, Plaintiff provided evidence that this information gap was arguably the moving force behind Mr. Torres' injury.

In addition to proving causation, Plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."   *Schneider*, 717 F.3d at 770 (quoting *Brown*, 520 U.S. at 407); *Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 759 (10th Cir. 2014) ("Where a plaintiff seeks to create § 1983 municipal liability for failing to prevent the bad acts of a subordinate, the plaintiff must show that the municipality evidenced 'deliberate indifference' to the impermissible conduct.").   Plaintiff can establish deliberate indifference in two ways.   A city can be put "on notice that its training program is inadequate" based on "specific incidents which establish a pattern of constitutional violations."

*Allen*, 119 F.3d at 842.  Separately, "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." *Id.*

In the run of cases, it is "ordinarily necessary" for plaintiffs to prove a pattern of similar violations in order to hold a municipality liable for a training failure.  *Connick*, 131 S. Ct. at 1365 (quoting  *Brown*, 520 U.S. at 409).  Here, Plaintiff did not establish such a pattern.  Plaintiff cites to the large number of deadly force encounters involving APD officers and the statistic that 54% of the encounters involved mentally ill suspects.  (Doc. 133 ¶ 81.)  This is insufficient under the Supreme Court's reasoning in *Connick*, 131 S. Ct. at 1360.  Arguing that the district attorney's office failed to train prosecutors in their obligations pursuant to *Brady v. Maryland*, the plaintiff in *Connick* presented evidence that the district attorneys regularly encountered *Brady* issues, and had repeatedly violated *Brady*'s mandate.  *Id.*  Specifically, during the relevant time period, Louisiana courts overturned four convictions in ten years based on the district attorney office's *Brady* violations.  *Id.*  The Supreme Court brushed this statistic aside, noting that the plaintiff's case involved a failure to disclose blood evidence while the four reversals involved other sorts of *Brady* violations.  *Id.*  The Supreme Court held that the reversals based on various types of *Brady* violations could not have put the district attorney's office on notice that it needed to train attorneys to turn over blood evidence—the "specific training . . . necessary to avoid this constitutional violation." *Id.*

Accordingly, Plaintiff must prove more than the fact that APD officers regularly encounter mentally ill citizens.  To establish the necessary pattern for Section 1983 failure to train liability, Plaintiff must present evidence that a similar intradepartmental communication

failure led to constitutional violations.  Only similar types of failures could have put APD "on notice" that it needed to train its officers "to avoid *this* constitutional violation."  *Id.* (emphasis added).  Plaintiff did not present any such evidence.  Under *Connick*, Plaintiff did not provide sufficient facts to establish a pattern of similar violations.

In "rare" cases, a plaintiff does not need to prove a pattern of similar violations, but can hold a municipality liable for a single-incident where the need for training was "so obvious" that the failure to train amounts to deliberate indifference.  *Id.* at 1361.  The constitutional violation must be a "highly predictable consequence" of the failure to train.  *Id.* at 1361 (quoting *Brown*, 520 U.S. at 409).  In *Connick*, the Supreme Court determined that to prevail, the plaintiff needed to show that the district attorney's office "was on notice that, absent specified training, it was 'highly predictable' that the prosecutors in his office would be confounded" by a particular training deficiency "and make incorrect *Brady* decisions as a result."  *Id.* at 1365.  Furthermore, the plaintiff "had to show that it was *so* predictable that failing to train the prosecutors amounted to *conscious disregard* for" constitutional rights.  *Id.*  The Supreme Court commented that the district court should have granted the defendant summary judgment as a matter of law because the plaintiff did not "establish that the policy of inaction was the functional equivalent of a decision by the city itself to violate the Constitution."  *Id.* at 1366 (quotations omitted).

Plaintiff did not establish that his case is the rare exception where a municipality is liable for a single alleged constitutional violation.  In order to meet the high standard explained in *Connick*, Plaintiff would need to show that it was "so obvious" that (1) a person with a mental illness who had been assigned a crisis intervention officer, (2) would later be investigated by conventional officers, (3) who would not discover a history of mental health illness or APD crisis intervention, and (4) that lack of information would lead the officers to use excessive force

against the person.  The Court is not willing to say that this string of events was "*so* predictable that failing to train" the officers to research or communicate better amounted to conscious disregard for Mr. Torres' constitutional rights.  *See id.* at 1365.

APD established the crisis intervention team based on a recognized need that many citizens who interact with the police force are mentally ill.  (Doc. 106 ¶ 5.)  The PERF Report commended the initiative as "an exemplary effort by the department to ensure that persons suffering from mental illness or emotional disturbances are handled in the most appropriate manner." (Def. Ex. C at 4, Doc. 106-3.)  Yet the circumstances surrounding Mr. Torres' death revealed a significant and dangerous gap in crisis intervention.   While the APD crisis intervention team was aware of Mr. Torres' mental illness and the best way to approach him, the Defendant Officers, assigned to Mr. Torres' case, were not informed.   The information gap represents a serious weakness in APD's crisis intervention response.  Plaintiff, however, did not provide sufficient evidence to prove that the information gap was "the functional equivalent of a decision by the city itself to violate the Constitution."  *Connick*, 131 S. Ct. at 1366.

In sum, *Canton* and *Connick* make it clear that the "failure to train" is a limited cause of action.  Although Plaintiff identified some gaping holes in APD's policies—looser requirements for non-uniformed officers and the failure to communicate known information about citizens with mental health challenges—these deficiencies are not sufficient to sustain a Section 1983 failure to train claim.  Defendants' motion to dismiss this claim is granted.

### 4.  Inadequate Screening During the Hiring Process

Plaintiff's fourth claim for municipal liability is that the City inadequately screened its applicants during the hiring process.  Plaintiff did not allege this claim in his Complaint. However, the Pretrial Order lists this as one of Plaintiff's claims.  (Pretrial Order at 4, Doc. 191.)

The Pretrial Order "controls the course of the action . . . ."  Fed. R. Civ. P. 16 (d); *see also Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[T]he inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."). Furthermore, Defendants did not object to Plaintiff bringing this claim.  In fact, Defendants were the first ones to notify the Court that Plaintiff had such a claim when they filed a motion for summary judgment focused on hiring practices.  (Doc. 109.)

Municipalities can be held liable for inadequately screening their applicants.  *Brown*, 520 U.S. at 410.  "Where a plaintiff presents a § 1983 claim premised upon the inadequacy of an official's review of a prospective applicants record, however, there is a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself."  *Id.*  A city cannot be held liable under Section 1983 simply because it hired a tortfeasor.  *Id.* at 403.  The standards for fault and causation are more stringent for an inadequate hiring claim than they are for an inadequate training claim.  *Id.* at 415-16.  "Merely showing that a municipal officer engaged in less than careful scrutiny of an applicant resulting in a generalized risk of harm is not enough to meet the rigorous requirements of 'deliberate indifference.'"  *Barney*, 143 F.3d at 1308.  Instead, the plaintiff must show "a strong connection between the background of the particular applicant and the specific constitutional violation alleged."  *Id.* at 1308.

Plaintiff asserts that the Supreme Court's *Brown* case is not determinative because he is not relying on a single instance of inadequate screening, but the City's decision to lower its hiring standards in order to increase the ranks.  (Doc. 133 at 40.)  In 2006, the Mayor of Albuquerque stated his goal to increase the number of police officers in APD.  (Pl. Ex. 3, Schultz Dep. 19:12-21.)  In response, APD had to focus on meeting the Mayor's quota rather than

waiting for qualified applicants to apply.  (*Id.* at 22:8-12.)  Plaintiff submitted evidence that at least one standard was lowered to reach this goal: prior to the hiring push, anyone with a marijuana misdemeanor within the past two years was automatically excluded.  (Pl. Ex. 1, Tate Dep. 131:14-132:11.)  During the hiring push, APD relaxed the standard to eighteen months.  (*Id.*)  "The change in APD's hiring standards, however, did not fall below the standards set by state law."  *Torres v. Albuquerque* ("*Torres I*"), No. D-202-CV 2011-06551, slip op. at 15 ¶ 95 (N.M.D. Ct. June 10, 2014).

To show that the City was deliberately indifferent when it lowered its standards for the hiring push, Plaintiff claims that the City was "on notice" that the officers hired during the push were likely to engage in excessive force.  "APD decided to lower hiring standards across the board, despite knowledge that the class of officers hired under these lax standards committed far more shootings than other classes."  (Doc. 133 at 40.)  To support this allegation, Plaintiff relies on the PERF Report finding that of the forty-seven officers involved in shooting incidents, nine were hired in the year 2007.  (Pl. Ex. 13 at 15.)  Far more officers hired in 2007 were involved in shootings than officers hired in any other year.  (*Id.*)  Although alarming, this Report could not have provided APD with the requisite notice before Mr. Torres' death.  The Report was issued two and a half months after Mr. Torres was shot.  (*Id.* at 1, dated June 23, 2011.)  Plaintiff did not offer any other evidence to support a finding that Albuquerque was deliberately indifferent to citizens' constitutional rights when it made its hiring push in 2006 or when it continued to retain Defendant Brown in April 2011.

The vast majority of Plaintiff's arguments focus on APD's decision to hire Defendant C.J. Brown.  Because that represents a single instance, the *Brown* standard does apply to Plaintiff's claim.  "Ordinarily, proof of a single incident of unconstitutional activity is not

sufficient to impose municipal liability." *Jenkins*, 81 F.3d at 994 (quoting *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993)).   Plaintiff must show "that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff."   *Brown*, 520 U.S. at 412. "The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong."   *Id.*

Defendant Brown was hired in 2007 as a lateral transfer from the police department in Roswell, New Mexico.   (Def. Ex. 2, Brown Dep. 6:12-13, 10:24-11:4, Doc. 109-2.)   Plaintiff points to four clusters of evidence to show that APD's decision to hire Defendant Brown demonstrates inadequate screening.   First, three of Defendant Brown's prior applications to police departments were rejected: Defendant Brown was rejected from APD in 1997 for bad credit after a divorce; he was rejected from the Rio Rancho police department once for failing his written exam, and a second time his application was "discontinued" because of "attitude."   (Pl. Ex. 17 at 1; Def. Ex. 2, Brown Test. Tr. 7:1-4, Doc. 109-2.)   Plaintiff does not explain what "discontinued" for "attitude" means, let alone demonstrate that these rejections are "strongly connected" to Mr. Torres' injury.   Second, APD did not investigate a complaint for tardiness from Hastings Entertainment or a reprimand from Albertsons grocery—jobs Defendant Brown held as a teenager.   (Doc. 133 ¶ 117.)   Plaintiff makes no effort to show that these incidents are connected, in any way, to Mr. Torres' injury.   Third, Defendant Brown was involved in two automobile accidents, including one where he received a reprimand for rear-ending an SUV while he was looking at his mobile data terminal.   (Doc. 133 177, Pl. Ex. 18, Doc. 133-18.) Again, Plaintiff makes no effort to show how these incidents are connected to Mr. Torres' injury. Fourth, and finally, Defendant Brown received five citizen complaints in seven years while serving in Roswell.   (Doc. 133 ¶ 118.)   Only one of these complaints was substantiated;

Defendant Brown was reprimanded for "demeanor." (Def. Ex. C, Brown Test. Tr. 240:2-14.) One of the complaints alleges that Defendant Brown drew his gun during a traffic stop. (Pl. Ex. 19, Doc. 133-19.) However, this complaint was not substantiated.

"Detective Brown's hiring . . . met the standards set forth in New Mexico law." *Torres I*, slip op. at 15 ¶ 98. One unsubstantiated complaint does not prove that the City was deliberately indifferent when it hired Defendant Brown. The connection is not strong enough to meet the standard under *Brown*. Plaintiff did not submit sufficient evidence to show that the City was deliberately indifferent to Mr. Torres' constitutional rights when it hired Defendant Brown. Defendants' motion for summary judgment on the inadequate screening claim is granted.

Finally, Plaintiff requests punitive damages against APD in his Complaint. (Compl, ¶ 65.) Defendants correctly note that punitive damages are not available against municipalities under Section 1983. (Doc. 109 at 20-21.) Plaintiff concedes this is true. (Doc. 133 at 41.) This portion of Defendants' motion for summary judgment is granted.

### C. Violation of the Americans with Disabilities Act

Under Title II of the Americans with Disabilities Act ("ADA"), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II applies to all state and local government departments—including police departments—and to the services, programs, and activities that those departments offer. *Id.*; 42 U.S.C. § 12131(1)(B). In the Tenth Circuit, and every other Circuit that has addressed the issue, ADA Title II applies to arrests. *See Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999) (holding that Title II applies to arrests); *see also Hainze v. Richards*, 207 F.3d 795, 802 (5th Cir. 2000); *Bricoll v. Miami-Dade Cnty.*, 480 F.3d

1072, 1085 (11th Cir. 2007); *Tucker v. Tennessee*, 359 F.3d 526, 534 (6th Cir. 2008); *Waller v. Danville*, 556 F.3d 171, 175 (4th Cir. 2009); *Sheehan v. City of San Francisco*, 743 F.3d 1211, 1232 (9th Cir.), *cert. granted* 135 S. Ct. 702 (2014).   Police departments serve the community by protecting public safety and arrests are one of the activities that police departments carry out to meet that responsibility.   When making arrests, police officers should not unnecessarily endanger citizens and cannot discriminate against persons with disabilities.

To show that Mr. Torres' rights under the ADA were violated, Plaintiff must show:

(1) that Mr. Torres was a qualified individual with a disability;

(2) that he was either excluded from participation in or denied the benefits of APD's programs, or activities, or was otherwise discriminated against; and

(3) that Mr. Torres' exclusion, denial of benefits, or discrimination was due to his disability.

*See Gohier*, 186 F.3d at 1219.   Defendants assume, for this motion, that Mr. Torres was a qualified individual with a disability.   (Doc. 104 at 25-26.)   That leaves the question: Did APD, by reason of Mr. Torres' disability, deny him the benefits of its services, programs, activities, or otherwise subject him to discrimination?

In *Gohier*, the Tenth Circuit recognized two theories for challenging arrests under ADA Title II.   186 F.3d at 1220.   The wrongful arrest theory is implicated when police officers, because they misperceived someone's disability as criminal activity, make an unjustified arrest. *Id.*   For example, in one case, police arrested a stroke victim for drunk driving because the man's speech was slurred and he looked unsteady.   *Id.* (citing *Jackson v. Sanford*, No. 94-12-P-H, 1994 WL 589617 (D. Me. Sept. 23, 1994)).   Plaintiff does not argue this theory.   Instead, Plaintiff relies on the second theory, failure to accommodate.   (Doc. 129 at 17-20.)   Under this second theory, APD is liable because it failed to reasonably accommodate Mr. Torres' disability "in the

course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Gohier*, 186 F.3d at 1220-21.  Failure to reasonably accommodate a person's disability constitutes discrimination under ADA Section 12132.  *See* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . .").

Plaintiff identifies several reasonable accommodations that APD could have implemented.  At the outset of this saga, "[i]f APD had taken the steps to reasonably accommodate citizens with mental illnesses, Officers Brown and Hilger . . . would have learned that Mr. Torres was suffering from schizophrenia . . . ." (Doc. 129 at 21.)  Plaintiff points to multiple practices to address this problem: (1) the crisis intervention team could have implemented a system where it "flagged or somehow made [information] available to warn officers who come into contact with [known mentally ill citizens] later on" (Doc. 129 at 21); (2) the Defendant Officers could have been trained to do "a simple background search" to find readily available information about Mr. Torres' mental illness (Doc. 129 at 8-10, 22); or (3) APD could have provided a "central database where officers could easily look up a subject . . . ." (Doc. 129 ¶ 10).  All three practices appear reasonable on their face and would have facilitated the accommodation of Mr. Torres' known disability.

Had the Defendant Officers known about Mr. Torres' disability, they could have implemented several other accommodations that APD already had in place, such as bringing a crisis intervention officer to speak with Mr. Torres (Doc. 129 at 21); calling backup officers (Doc. 129 at 23); calming the mentally ill suspect (*id.*); or talking with family members to obtain information (*id.*).  Instead, the uninformed Defendant Officers arguably misperceived Mr.

Torres' literal responses as cheekiness and turned a non-violent "knock-and-talk" into a deadly confrontation.  Defendant Brown testified that if he had known about Mr. Torres' mental illness, he might have approached the situation differently.  (Pl. Ex. 24, Brown Test. Tr. 266:6-20, Doc. 129-24.)  In that regard, APD's failure to accommodate caused Mr. Torres to "suffer greater injury or indignity in [the arrest] process than other arrestees."  *See Gohier*, 186 F.3d at 1220-21. The APD officers did not serve and protect Mr. Torres, they subjected him to an unnecessarily fatal arrest.

In *Gohier*, the Tenth Circuit hypothesized that "Gohier might have argued that Title II required [the City] to better train its police officers to recognize reported disturbances that are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability."  186 F.3d at 1222 (citing *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998)).  However, the plaintiff did not make the argument.  *Id.*  More recently, the Circuit again recognized the potential for such a claim, but determined that the plaintiff did not meet his burden to prove it.  *See Sperry v. Maes*, 592 F. App'x 688, 698 (10th Cir. 2014).  Defendants cite other cases where Circuit Courts have found that the plaintiff did not prove a failure to train.  (Doc. 104 at 34.)  These cases, however, are not controlling precedent and Defendants do not make an effort to show why they are persuasive for this case.

In short, Plaintiff makes an initial showing that Mr. Torres suffered discrimination based on his disability when APD failed to implement a system of communication between the crisis intervention team and conventional officers.  This failure directly led the Defendant Officers to escalate their encounter when they should have taken Mr. Torres' mental illness into account. Defendants raise two counterarguments: (1) the officers did not know that Mr. Torres was

disabled, and (2) the officers did not violate the ADA because they were facing exigent circumstances.  (Doc. 104 at 26-27, 31-33.)

### 1. *Knowledge of Disability*

Defendants make two arguments regarding knowledge.  First, they argue that a rule requiring officers on the street "to don white coats and correctly diagnose every subject they came into contact with" would be unworkable.  (Doc. 104 at 27.)  The Court tends to agree that such a requirement would not be feasible.  Arguably, requiring officers to make street-level diagnoses would require a level of knowledge generally unavailable to police officers and would therefore not be a reasonable requirement.  *See* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *unless* the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.") (emphasis added).  However, that is not the situation at hand.  The Defendant Officers would not have needed to make a street-level diagnosis if APD had systems to inform officers of known disabilities in advance.

As a rule, "[a] public entity cannot know that a modification to its services under the ADA is necessary if it does not first understand that an individual requires such modification *because* he is disabled."  *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007).  Defendants argue that because the Defendant Officers did not know that Mr. Torres was disabled, there is no ADA liability.  (Doc. 104 at 26.)  If this were an individual capacity suit against the officers, this argument might be persuasive.  Instead, this is a Title II case against APD.  Indisputably, APD did know that Mr. Torres was disabled.  At least five APD officers knew that Mr. Torres had schizophrenia.  (Pl. Exs. 4, 11, 12, 13, 14, 15; Docs. 129-4, -11

to -15.)  Knowing that Mr. Torres had a disability caused APD to assign him a crisis intervention officer.  (Pl. Ex. 4, Lopez Dep. 4:24-5:7, 15:5-17:2.)  APD arguably also knew that the nature of Mr. Torres' disability required accommodations and that is why APD assigned Mr. Torres a crisis intervention officer.  (*Id.*)  In addition, Mr. Torres' mother specifically requested that APD call her whenever they had questions for her son.  (Pl. Ex. 17, Renetta Torres Dep. 83:17-21.)  Yet, despite APD's knowledge, when the Defendant Officers went to arrest Mr. Torres, they were not equipped with the necessary information.

Plaintiff further argues that Mr. Torres' disability and need for accommodation was obvious.  Given the nature of the allegations against him, the readily available information about his mental health, and the road rage victim's characterization of Mr. Torres as "crazy," Plaintiff says that the Defendant Officers should have known about Mr. Torres' disability.  (Doc. 129 at 7, 9, 22-23.)  The Court need not reach the merits of this argument—or whether "should have known" is an appropriate standard—because it finds that APD, the entity liable under Title II, had the requisite knowledge.

### 2. *Direct Threat Defense*

Defendants argue that the Defendant Officers did not need to make reasonable accommodations because they were facing exigent circumstances.  (Doc. 104 at 29-33.)  In making this argument, Defendants rely heavily on the Fifth Circuit's opinion in *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000).  In *Hainze*, the Circuit ruled that the ADA does not require officers to make accommodations when they are facing potentially life-threatening situations.  *Id.* at 801-02.  In such situations, officers are permitted to use reasonable force under *Graham v. Connor* and the ADA cannot require that officers use less force when their safety is at risk.  *Id.*

41

This reasoning comports with the ADA's direct threat defense.   Under the ADA regulations, no entity is required to provide a public accommodation to an individual "when that individual poses a direct threat to the health or safety of others."   28 C.F.R. § 36.208(a).   A "[d]irect threat means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services . . . ."   28 C.F.R. § 36.104.   The determination that a person "poses a direct threat to the health or safety of others" must be "based on reasonable judgment" and "the best available objective evidence."   28 C.F.R. § 36.208(b).   The public entity must also determine "whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk."   *Id.*

This defense is unavailable to Defendants.   Even had Mr. Torres pointed a gun at the officers—a hotly disputed fact—APD had already failed to accommodate Mr. Torres in several respects.   The Defendant Officers were not responding to an emergency dispatch.   Nothing required the Defendant Officers to knock on Mr. Torres' door on that particular day.   (Pl. Ex. 5, Schultz Dep. 75:16-22, Doc. 129-5.)   Prior to that day, Defendant Brown waited almost two months to draw up a warrant.   (Pl. Ex. 23, Doc. 129-23.)   After getting the warrant signed, Defendant Brown waited an additional eight days to serve the warrant.   (*Id.*)   APD encourages its officers to conduct comprehensive background investigations because knowing an arrestee's background is safer for the officers, the arrestee, and the public.   (Pl. Ex. 1, Tate Dep. 55:24-56:23, Doc. 129-1.)   Yet Defendant Brown was not trained to find easily accessible information regarding Mr. Torres' mental health.   (Pl. Ex. 7, Brown Dep. 55:9-13; Pl. Ex. 18, Doc. 129-18.)   APD did not have a central database where Defendant Brown could have found that information.   (Pl. Ex. 5, Schultz Dep. 112:25-113:7.)   Nor did the crisis intervention team alert its fellow

officers that Mr. Torres had a mental disability.  Because of this, the Defendant Officers failed to follow the standard operating procedures that apply to people with mental illness or suspected mental illness.   (S.O.P. 12-13-9, Pl. Ex. 3 at 3, Doc. 129-3.)   APD's alleged failure to accommodate Mr. Torres occurred long before any exigent circumstances arose.

### 3.   *The City's Liability*

Defendants' arguments and defenses do not relieve them of their ADA responsibilities. Considering the facts in a light most favorable to Plaintiff, APD arguably violated Mr. Torres' rights under the ADA.  Both parties assume that APD is only liable for monetary damages if it acted intentionally or with deliberate indifference.  (Doc. 104 at 33; Doc. 129 at 20.)  Intentional discriminatory action is required for liability under the Rehabilitation Act, *Barber ex rel. Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228-29 (10th Cir. 2009), and may be required for ADA Title II cases.  *See Keirnan v. Utah Transit Auth.*, 339 F.3d 1217, 1220 (10th Cir. 2003) ("[B]ecause Appellant is not alleging intentional discrimination or out-of-pocket expenses, damages might not be available should a court later find in her favor on the merits.").

If Plaintiff must show intentional discrimination, he can meet the requirement by proving "deliberate indifference."  *Barber*, 562 F.3d at 1228.  Entities are deliberately indifferent when they ignore a strong likelihood that their policies will likely result in a violation of federally protected rights.  *See id.* at 1228-29.  The analysis is similar to the standard for *Canton* deliberate indifference, but here the federally protected right is defined by the ADA, not the Constitution. *See also Sperry*, 592 F. App'x at 698 (citing *Canton*, 489 U.S. at 390) (explaining that the plaintiff needed to show that police department was "deliberately indifferent" for an ADA Title II claim).

Plaintiff provided sufficient evidence to prove that APD was deliberately indifferent to Mr. Torres' rights under the ADA.  The APD Police Chief was aware that APD officers were increasingly encountering mentally ill citizens.  (Pl. Ex. 5, Schultz Dep. 105:18-22.)  Furthermore, he was aware that many mentally ill citizens had repeat encounters with APD officers.  (*Id.*)  Because APD was aware that officers faced difficulties when confronted with mentally ill citizens, APD created a crisis intervention team.  (*Id.* at 107:8-108:13.)  But only 25% of the force was specially trained in crisis intervention, leaving 75% of the force less trained.  (*Id.* at 111:16-19.)  Statistically-speaking, a majority of mentally ill citizens would have encounters with the 75% of conventionally-trained officers, rather than the 25% of specially-trained officers.  Yet APD did not create any systems to facilitate interactions and communications between the trained and less trained officers.  (*Id.* at 112:25-113:7, 146:12-23, 143:23-144:9.)  Given this information gap, how did APD expect 75% of officers to act when they encountered mentally ill citizens?  Specifically, here, Mr. Torres' crisis intervention officer made a note in his file to "keep tabs" on Mr. Torres.  (Pl. Ex. 4, Lopez Dep. 67:15-20.)  Despite this intention, no information about Mr. Torres' known disability was communicated to the Defendant Officers during their two-month investigation into Mr. Torres.  They were never told that the Torres family had requested to be contacted whenever Mr. Torres had a brush with the law.  (Pl. Ex. 17, Renetta Torres Dep. 83:17-21.)  From this evidence, a jury could reasonably conclude that APD was deliberately indifferent to Mr. Torres' rights under the ADA.

Plaintiff provided sufficient facts to support his claim that APD is liable for violating Mr. Torres' ADA rights.  Accordingly, the Court denies Defendants' motion for summary judgment. Plaintiff also prays for punitive damages against Defendant APD under the ADA claim.  (Compl. ¶ 76.)  Punitive damages, however, are not available for private suits brought under Title II.  *See*

*Barnes v. Gorman*, 536 U.S. 181, 189 (2002) ("[P]unitive damages may not be awarded in private suits . . . brought under § 202 of the ADA and § 504 of the Rehabilitation Act.").

IV.     **CONCLUSION**

Plaintiff raised a genuine dispute of material fact regarding the Defendant Officers' qualified immunity.  Thus, Defendants' motion for summary judgment on the excessive force claim is denied.  Plaintiff also produced sufficient evidence to defeat Defendants' motion for summary judgment on the municipal custom of condoning force claim.  Defendants, however, won summary judgment on the inadequate hiring and training claims.  The Court denied Defendants' motion for summary judgment on the inadequate supervision claim on the grounds Defendants argued, however, the Court struck the claim as redundant.  On the ADA claim, Plaintiff produced evidence to show that APD arguably violated Mr. Torres' ADA rights and, accordingly, summary judgment is inappropriate on that claim.  Finally, Plaintiff cannot bring a claim for punitive damages against APD under the Section 1983 or the ADA claims.

**THEREFORE**,

**IT IS ORDERED** that:

(1) Defendants' motion for summary judgment on the ADA claim (Doc. 104) is **DENIED**;

(2) Defendants' motion for summary judgment on the basis of qualified immunity (Doc. 105) is **DENIED**;

(3) Defendants' motion for summary judgment on Plaintiff's inadequate training claim (Doc. 106) is **GRANTED**;

(4) Defendants' motion for summary judgment on Plaintiff's unlawful municipal custom claim (Doc. 107) is **DENIED**;

(5) Defendants' motion for summary judgment on Plaintiff's inadequate supervision claim (Doc. 108) is **DENIED**, but the Court **STRIKES** this claim from the Complaint; and

(6) Defendants' motion for summary judgment on Plaintiff's inadequate screening during the hiring process claim and on Plaintiff's punitive damages against APD (Doc. 109) is **GRANTED**.

**ROBERT C. BRACK**
UNITED STATES DISTRICT JUDGE